J-S19044-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| BENGAL CONVERTING SERVICES, INC. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| RYAN GIBNEY, | : | |
| | : | |
| Appellant | : | No. 1626 EDA 2015 |

Appeal from the Order entered May 18, 2015
in the Court of Common Pleas of Montgomery County,
Civil Division, No. 15-09220

BEFORE:  BENDER, P.J.E., STABILE and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:                    **FILED APRIL 19, 2016**

Ryan Gibney ("Gibney") appeals from the Order granting emergency injunctive relief to Bengal Converting Services, Inc. ("Bengal").  We affirm the Order, as modified in accordance with this Memorandum.

In its Opinion, the trial court set forth its findings of fact, which we adopt herein for this appeal.  *See* Trial Court Opinion, 7/23/15, at 1-4.

On April 30, 2015, Bengal filed a Complaint for Emergency Injunctive Relief based on Gibney's violation of the confidentiality and non-compete covenants included in his employment agreement with Bengal ("Employment Agreement").  On May 18, 2015, the trial court entered an Order granting a temporary preliminary injunction to Bengal ("the injunction Order").  Thereafter, Gibney filed a timely Notice of Appeal and a court-ordered Statement of Matters Complained of on Appeal.

On appeal, Gibney raises the following issues for our review:

1. Did the trial court err by enforcing[,] until May 15, 2017[,] the two-year non-compete provisions in the [E]mployment [A]greement entered on September 16, 2013[,] between Bengal [] as the employer, and [] Gibney[,] as the employee[,] where Gibney's employment by Bengal had been terminated on December 31, 2013[,] when Bengal removed Gibney from its payroll, and thereafter Gibney was paid as a subcontractor by Monterey Leasing LP ["Monterey"], and issued an IRS Form 1099 for his work?

2. Did the trial court err by enforcing the non-compete provisions in the Employment Agreement beyond the scope of the restrictions contained in the Employment Agreement that limited Gibney's employment within 200 miles of Bengal's business location?

3. Did the trial court err by failing to conclude that Bengal breached the Employment Agreement with Gibney because Bengal failed to pay Gibney the compensation to which Gibney was entitled under the terms of the Employment Agreement, and Bengal was thereby barred from equitable relief by the doctrine of unclean hands?

4. Did the trial court err by incorrectly concluding that Gibney engaged in competition with Bengal when Gibney sold paper for Edgewood Paper Company ["Edgewood"], which is a "broker," not a competitor of Bengal, which is a "converter[?]"

5. Did the trial court err by deciding [that] the experience, knowledge and skill obtained by Gibney[,] as a result of his employment by Bengal, was confidential information that belonged to Bengal, and was entitled to protection as Confidential Material under the terms of the Employment Agreement?

6. Did the trial court err by granting an injunction where Bengal failed to provide evidence to support the prerequisites for injunctive relief?

J-S19044-16

Brief for Appellant at 4-5.[1]

The purpose of a preliminary injunction is to prevent irreparable injury or gross injustice by preserving the *status quo* as it exists, or as it previously existed before the acts complained of in the complaint. **Ambrogi v. Reber**, 932 A.2d 969, 974 (Pa. Super. 2007).

> [O]n an appeal from a decree … granting … a preliminary injunction, we will not inquire into the merits of the controversy, but will, instead, examine the record only to determine if there were any apparently reasonable grounds for the actions of the court below. Moreover, we will not pass upon the reasons for or against such action unless it is plain that no such grounds existed or that the rules of law relied on are palpably wrong or clearly not applicable.

**Sidco Paper Co. v. Aaron**, 351 A.2d 250, 257 (Pa. 1976) (internal citations and quotation marks omitted).

In his first issue, Gibney contends that, as of September 16, 2013, he was employed by Bengal as an at-will employee under the terms of the Employment Agreement, and subject to termination for any reason or no reason. Brief for Appellant at 27. Gibney asserts that, beginning January 1, 2014, Bengal unilaterally converted Gibney to subcontractor status, and his pay was drastically reduced. *Id*. at 25-26. Gibney claims that, by changing his employment to subcontractor status, Bengal terminated his at-will employment status. *Id*. Gibney contends that, because his employment

---

[1] The Argument section of Gibney's brief on appeal does not correspond to his Statement of Questions Involved. **See** Pa.R.A.P. 2119(a). Thus, we have attempted to locate within Gibney's brief the portions of his Argument which correspond to the questions he raises on appeal.

- 3 -

under the Employment Agreement terminated as of December 31, 2013, the two-year non-compete covenant contained therein must terminate as of December 31, 2015. *Id*. at 25. Gibney argues that such termination is consistent with the definition of "Separation of Service" found in the Employment Agreement.[2] *Id*. Gibney contends that the trial court erred by concluding that he continued to be employed by Bengal, under the terms of the Employment Agreement, until May 15, 2015, even though he was no longer paid as an employee, and his pay was drastically reduced from the amount promised in the Employment Agreement. *Id*. at 28. Gibney asserts that the trial court improperly expanded the terms of the Employment Agreement by extending the non-compete restriction until May 15, 2017. *Id*. at 25-26. Gibney further asserts that the restriction on his employment should not have been enforced under the circumstances of this case, and the trial court erred by enforcing the restriction beyond December 31, 2015. *Id*.

The trial court addressed Gibney's first claim, set forth the relevant law, and concluded that, because the Employment Agreement was entered into between Gibney, on the one hand, and Bengal *and its affiliates* on the other, Gibney's change in employment from an employee of Bengal to a contractor of its affiliate, Monterey, did not operate to terminate the

---

[2] The Employment Agreement provides that "Separation of Service" means "the termination of employment, whether voluntary or involuntary, for 'cause' or without 'cause,' and whether as a result of death, disability or the cessation of business of [Bengal]." Employment Agreement, 9/17/13, at 6.

Employment Agreement. *See* Trial Court Opinion, 7/23/15, at 5-9; *see also id*. at 8-9 (finding that, up until his termination on February 16, 2015, Gibney was, in fact, an employee of Bengal, as he used a car, cell phone and computer supplied by Bengal, and was required to work fixed hours from Bengal's place of business). Our review of the record discloses apparently reasonable grounds for the trial court's determination, and, having found no abuse of discretion, we affirm on this basis as to this issue. *See id*. at 5-9.

In his second issue, Gibney contends that the scope of the injunction Order entered by the trial court exceeds the scope of the covenant not to compete included in the Employment Agreement, and is *per se* overly broad. Brief for Appellant at 29. Gibney points to the 200-mile restriction contained in the Employment Agreement's covenant not to compete, and asserts that the trial court's injunction Order contains no such restriction.[3] *Id*. at 29. Gibney claims that, in its Opinion, the trial court acknowledged its error, but noted that the 200-mile limitation "does not affect the prohibition against soliciting Bengal's customers, who might be anywhere." *Id*. (citing

---

[3] The non-compete covenant in the Employment Agreement provides, in relevant part, that "the Employee shall not, within a two hundred (200) mile radius of any business location of [Bengal,] … be employed by … any business that provides services or products that compete with the business then being conducted by [Bengal] …." Employment Agreement, 9/17/13, at 4.

Trial Court Opinion, 7/23/15, at 9).[4]

The trial court addressed Gibney's second claim, and agrees that the restriction in the injunction Order, that Gibney not "compete with Bengal in paper sales and converting for two years," should be amended to add the phrase "within 200 miles of any business location of Bengal Converting." Trial Court Opinion, 7/23/15, at 9. We agree with the reasoning of the trial court. Accordingly, the injunction Order must be modified to include, at the end of paragraph "a," the phrase "within 200 miles of any business location of Bengal Converting."

In his third issue, Gibney contends that, by entering its injunction Order, the trial court granted equitable relief to Bengal, despite its unclean hands. Brief for Appellant at 35. Gibney asserts that Bengal never provided him with a $1,000,000 life insurance policy that it had promised to provide to Gibney in the Employment Agreement. *Id*. Gibney claims that, because

---

[4] Gibney also points to the restriction in the trial court's injunction Order that he not "solicit any customer or former customer of Bengal," and contends that the restriction is overly broad, because there is no way for Gibney to know who is or was a customer of Bengal. Brief for Appellant at 26. Gibney further asserts that no other employer can hire him without knowing Bengal's customers, or they run the risk of participating in Gibney's violation of the injunction Order. *Id*. at 29-30. Gibney did not raise this issue in his Statement of Matters Complained of on Appeal. Therefore, it is waived. *See Korman Commercial Properties, Inc. v. The Furniture.com, LLC*, 81 A.3d 97, 102-03 (Pa. Super. 2013) (holding that, if an appellant is directed to file a concise statement of matters to be raised on appeal pursuant to Pa.R.A.P. 1925(b), any issues not raised in that statement are waived).

Bengal breached the Employment Agreement, it should not be permitted to compel Gibney's performance under the Employment Agreement. *Id*.

In its Opinion, the trial court addressed Gibney's third claim and concluded that it lacks merit, stating as follows:

> Page two of the [Employment A]greement contains a handwritten notation concerning $2[,000,000] in life insurance, half to "wife" and half to "SHK or Bengal[.]"[] The [Employment A]greement does not state who was to pay for this insurance, and the court finds from this testimony[,] and the fact that the policy in favor of [Gibney's] wife was paid for by payroll deductions from [] Gibney, that Bengal [] complied with its part of the [Employment A]greement.

Trial Court Opinion, 7/23/15, at 2; *see also* N.T., 5/15/15, at 130-32 (wherein Scott Korn testified that Bengal paid for the $1,000,000 portion of the $2,000,000 life insurance policy that was to benefit Bengal in the event that Gibney died, but that Gibney was required to pay for the other $1,000,000 portion of the policy that was to benefit his wife). Our review of the record discloses apparently reasonable grounds for the trial court's determination, and, having found no abuse of discretion, we affirm on this basis as to this issue. *See* Trial Court Opinion, 7/23/15, at 2, 10; *see also* N.T., 5/15/15, at 130-32.[5]

In his fourth issue, Gibney asserts that the restriction in the injunction Order that he not compete with Bengal in "paper sales and converting" is

---

[5] The trial court further determined that, if a breach of the Employment Agreement by Bengal had, in fact, occurred, then Gibney had waived the breach by failing to assert it in a timely fashion. *See* Trial Court Opinion, 7/23/15, at 10.

limitless, overly broad, and extends beyond the intent of the restrictive covenant included in the Employment Agreement. Brief for Appellant at 26. Gibney asserts that this restriction should be limited to the converting business, in which Bengal is engaged, and should not preclude Gibney from engaging in paper sales generally. *Id*. at 26, 30-31. Gibney asserts that Bengal competes with other converters in a commodity business, and that Gibney is neither a converter nor a broker. *Id*. at 30. Gibney claims that the trial court's reasoning that paper mills and brokers compete with converters constitutes "faulty logic," "is unsupported by the record, and ignores the reality of business." *Id*. at 30. Gibney further asserts that the injunction Order is unenforceable because it eliminates or represses competition, and is not reasonably necessary to protect Bengal because Bengal, as "a twenty million dollar company with millions of dollars of plant, machinery and equipment[,]" needs no protection from Gibney. *Id*. at 30, 31.

Additionally, Gibney claims, the only thing that Bengal established at the injunction hearing was that Edgewood filled a $35,000 order to The Flyer, which caused no harm to Bengal because it did not have inventory to fill the order. *Id*. at 32. Gibney contends the business of selling a commodity like paper depends on price and availability, not on a relationship with a particular vendor or employee. *Id*. Gibney asserts that, contrary to the trial court's finding otherwise, the testimony at the injunction hearing

established that customers reach out to numerous suppliers to locate available product at the prevailing market price, and that "anybody will buy from anybody." ***Id***. at 32-33.

In its Opinion, the trial court addressed Gibney's fourth claim and concluded that it lacks merit, stating as follows:

> The business of Bengal [] is paper products for commercial printers and publishers. These companies have three sources for paper products: manufacturer or mills, brokers, and converters. The business [*sic*] of brokers and converters overlap considerably. Brokers sell to printers products from several sources, and converters sell to printers products they convert to meet the needs of those customers, using specialized machinery. Where ever [*sic*] the paper comes from[,] it is purchased by the printers and publishers to meet their particular needs. Whether a broker gets it from a mill, in odd lots[,] or from a converter does not matter to the customer. Likewise, it does not matter to these customers if a converter makes a paper product by converting some other product[,] or buys and re-sells paper from odd lots or a mill. Therefore, the court finds [that] brokers and converters are competitors.
>
> Bengal [] was able to find a number of documents that showed [] Gibney was competing with it. [] Gibney asked customers of Bengal to change his contact information from Bengal to his personal email address and telephone number, and then told them he was now selling paper independently. Bengal also offered into evidence an email in which [] Gibney disparaged Bengal []. After repeated denials, [Gibney] finally admitted he knew how Bengal formulated its prices, and, on at least a few occasions, admitted he undercut Bengal's prices to its customers. Bengal offered evidence that [] Gibney sold paper to The Flyer, GreenCross, Inc., Printwell, Shweiki, Seckman, Angstrom, California Offset and other customers of Bengal. He tried to get through to other Bengal [] customers.

Trial Court Opinion, 7/23/15, at 3-4; ***see also id***. at 10-11. Our review of the record discloses apparently reasonable grounds for the trial court's

- 9 -

determination, and, having found no abuse of discretion, we affirm on the basis of the trial court's Opinion as to this issue. *See* Trial Court Opinion, 7/23/15, at 3-4, 10-11.

In his fifth issue, Gibney contends that, to the extent that confidential information was in jeopardy of being disclosed, the trial court's injunction Order sufficiently protected that information, without the need to also bar Gibney from gainful employment. Brief for Appellant at 33. Gibney asserts that he did not need or even use any Bengal confidential information, and that he has no pricing information to undermine Bengal's ability to sell. *Id*. at 34. Gibney claims that he had access to all the buyers and sellers in the industry through sources other than Bengal, and that he can work in the paper industry without using any Bengal proprietary information. *Id*. Gibney argues that the "confidential information" that Bengal seeks to protect is the knowledge, skill and mental ability obtained by Gibney while working for Bengal, which is not the property of Bengal. *Id*.

In its Opinion, the trial court addressed Gibney's fifth claim and concluded that it lacks merit, stating as follows:

> [Gibney] sold paper for Edgewood [], a paper broker and competitor of Bengal[], located in Yardley, Pennsylvania, within 70 miles of Bengal['s] place of business. [Gibney] sold to customers of Bengal [] through Edgewood and other companies. The court rejected [] Gibney's assertions that purchasers of printing paper could be found through a Google® search, because, while that may be so, this is not how people are able to sell paper. Those doing the purchasing will not talk to just anyone, and [] Gibney was able to get through to them because they knew him from Bengal []. There is no dispute that [Gibney]

- 10 -

was selling to Bengal['s] customers. It took Bengal years to develop these customers. [] Gibney's claim that he was not competing with Bengal[,] because it [*sic*] and broker's paper came from different sources[,] is not credible. Printing paper is printing paper, and what matters to printers is that the paper meets their needs and comes for the right price from someone they trust. Whether it comes from a broker[,] or converter[,] or directly from a mill does not matter. As far as competition goes, what matters is the willingness of those purchasers to speak to the person selling it. [] Gibney gained his entrée to them through his employment at Bengal [].

Trial Court Opinion, 7/23/15, at 4; *see also id*. at 11. Our review of the record discloses apparently reasonable grounds for the trial court's determination, and, having found no abuse of discretion, we affirm on this basis as to this issue. *See* Trial Court Opinion, 7/23/15, at 4, 11.

In his final issue, Gibney contends that the trial court used the wrong standard, and, prior to entering its injunction Order, failed to consider the relative hardship that the injunction Order would impose on Gibney, or Bengal's need for protection. Brief for Appellant at 31-32. Gibney claims that he has no specialized training, other than "a little more than three years of experience in the paper industry at Bengal[,]" and that any harm that he "could possibly cause to a multimillion dollar enterprise like Bengal, is negligible, and was unsubstantiated by Bengal at the injunction hearing." *Id*. at 32. Gibney argues that he is irrelevant in the marketplace and that Bengal needs no protection from him. *Id*. at 31. Gibney asserts that the injunction Order renders him unemployable in his best field for two years beyond the scope of the Employment Agreement. *Id*. at 32.

The trial court addressed Gibney's final issue, set forth the relevant law, and concluded that it lacks merit. **See** Trial Court Opinion, 7/23/15, at 11-13. Our review of the record discloses apparently reasonable grounds for the trial court's determination, and, having found no abuse of discretion, we affirm on this basis as to this issue. **See id**.

Having determined that there are apparently reasonable grounds upon which the trial court determined that equitable enforcement of the restrictive covenants in the Employment Agreement was necessary to protect Bengal against wrongful appropriation of its customer relationships by Gibney, we agree with the trial court's determination that Bengal is entitled to injunctive relief, but modify the injunction Order, as specified above.

Order modified in accordance with this Memorandum, and as modified affirmed. Jurisdiction relinquished.

Judge Stabile joins the memorandum.

P.J.E. Bender concurs in the result.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/19/2016

- 12 -



2015-09220-0014   7/23/2015 12:46 PM   # 10401582
Opinion
Rcpt#Z2470234  Fee:$0.00
Mark Levy - MontCo Prothonotary

## COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
### CIVIL ACTION

BENGAL CONVERTING SERVICES, INC. :   NO. 2015-09220

           v.

RYAN GIBNEY

### OPINION

**DRAYER, S.J.**                                    JULY  , 2015

The request of plaintiff, Bengal Converting Services, Inc., for a preliminary injunction against its former employee, defendant Ryan Gibney, came before this court on May 15, 2015. At the conclusion of the hearing the court issued a preliminary injunction. Mr. Gibney appealed to the Superior Court on May 29, 2015. This court directed him to file a statement of errors complained of on appeal by Order dated June 4, 2015. Mr. Gibney filed that statement on June 11, 2015. This Opinion also sets forth the court's findings of fact and conclusions of law, in narrative form.

### Findings of Fact

Ryan Gibney was first employed by Bengal Converting Services, Inc. on February 2, 2012 as account manager. At that time the parties entered into an employment agreement which included restrictive covenants. Later, Mr. Gibney was promoted to director of

sales, and then, on September 16, 2013 was promoted to vice president of sales, with a significant increase in pay. On that date the parties entered into a new employment agreement (Exhibit P-A) that contained confidentiality, non-competition and other terms that will be reviewed and discussed in the Conclusions of Law, below. There is no dispute that this agreement was made by the parties. Mr. Gibney read and understood all the pertinent terms. Mr. Gibney was required to work fixed hours, 9 A.M. to 6 P.M., from Bengal Converting's place of business. Bengal Converting supplied a car, a cell phone and a computer, Mr. Gibney's "tools". Sometime in 2014 his pay was reduced and he was paid as an independent contractor by a company, Monterey Leasing, L.P., which is an "affiliate" of plaintiff, Bengal Converting Services, Inc., within the meaning of the agreement's preamble, quoted below. The other terms and conditions of his employment were unchanged, and Mr. Gibney continued to do his job during the same hours and in the same manner. He did not assert those changes were a material breach of contract until after he was fired.

Page two of the agreement contains a handwritten notation concerning $2 million in life insurance, half to "wife" and half to "SHK or Bengal". The agreement does not state who was to pay for this insurance, and the court finds from the testimony and the fact that the policy in favor of his wife was paid for by payroll deductions from Mr. Gibney, that Bengal Converting complied with its part of the agreement.

Sometime during his employment at Bengal Converting Mr. Gibney was discharged and re-hired, a matter not at issue here. On February 16, 2015 he was fired by the president of Bengal Converting, Scott H. Korn. The reason for that is not before the court, but there is a suggestion that Mr. Gibney was believed to be selling paper to Bengal customers on his

2

own. That was not proven, but there is evidence Mr. Gibney was preparing a Power Point® presentation for another paper company that was trying to get an account in Turkey.

In any event, within a matter of only four days of his discharge Mr. Gibney had a competing enterprise up and running. He was selling paper to Bengal Converting's customers. The court finds Mr. Gibney was not credible when he testified about critical disputed matters, based on his demeanor, his incredible explanation of how he was not competing, and his admission he lied to his new customer about the progress of the Power Point® presentation, just as something he would do in business.

The business of Bengal Converting is paper products for commercial printers and publishers. These companies have three sources for paper products: manufacturers or mills, brokers, and converters. The business of brokers and converters overlap considerably. Brokers sell to printers products from several sources, and converters sell to printers products they convert to meet the needs of those customers, using specialized machinery. Where ever the paper comes from it is purchased by the printers and publishers to meet their particular needs. Whether a broker gets it from a mill, in odd lots or from a converter does not matter to the customers. Likewise, it does not matter to these customers if a converter makes a paper product by converting some other product or buys and re-sells paper from odd lots or a mill. Therefore the court finds brokers and converters are competitors.

Bengal Converting was able to find a number of documents that showed Mr. Gibney was competing with it. Mr. Gibney asked customers of Bengal to change his contact information from Bengal to his personal email address and telephone number, and told them he was now selling paper independently. Bengal also offered in evidence an email in which Mr.

3

Gibney disparaged Bengal Converting. After repeated denials, he finally admitted he knew how Bengal formulated its prices, and, on at least a few occasions, admitted he undercut Bengal's prices to its customers. Bengal offered evidence that Mr. Gibney sold paper to The Flyer, GreenCross, Inc., Printwell, Shweiki, Seckman, Angstrom, California Offset and other customers of Bengal. He tried to get through to other Bengal Converting customers.

He sold paper for Edgewood Paper, a paper broker and competitor of Bengal Converting, located in Yardley, Pennsylvania, within 70 miles of Bengal Converting's place of business. He sold to customers of Bengal Converting through Edgewood and other companies. The court rejected Mr. Gibney's assertions that purchasers of printing paper could be found through a Google® search, because, while that may be so, this is not how people are able to sell paper. Those doing the purchasing will not talk to just anyone, and Mr. Gibney was able to get through to them because they knew him from Bengal Converting. There is no dispute he was selling to Bengal Converting's customers. It took Bengal years to develop these customers. Mr. Gibney's claim that he was not competing with Bengal Converting because it and broker's paper came from different sources is not credible. Printing paper is printing paper, and what matters to printers is that the paper meets their needs and comes for the right price from someone they trust. Whether it comes from a broker or a converter or directly from a mill does not matter. As far as competition goes, what matters is the willingness of those purchasers to speak to the person selling it. Mr. Gibney gained his entrée to them through his employment at Bengal Converting.

## Conclusions of Law

Mr. Gibney's Statement of Errors Complained of on Appeal sets out 11 issues. This brings to mind the opinion of the Honorable Ruggero J. Aldisert that:

"[when [I read]] an appellant's brief that contains ten or twelve points, a presumption arises that there is no merit to any of them. I do not say it is an irrebuttable presumption, but it is a presumption that reduces the effectiveness of appellate advocacy." *United States v. Hart*, 693 F.2d 286, 287 (3d Cir.1982), quoted in *Hannis Estate v. Ashland State General Hospital*, 123 Pa. Cmwlth. 390, 554 A.2d 574, 576, n.1 *allocatur denied*, 524 Pa. 632, 574 A.2d 73 (1989); *see also*, *Lakatosh Estate*, 441 Pa. Super. 133, 656 A.2d 1378, 1380, n. 1 (1995), quoting the same language from Aldisert, "The Appellate Bar: Professional Competence and Professional Responsibility-A View From the Jaundiced Eye of One Appellate Judge", 11 Cap. U. L. Rev. 445, 458 (1982).

This court will address these issues on the merits, in turn.

**Issue No. 1:** "The Court erred by enforcing the non-compete provisions in the employment agreement entered on September 16, 2013 between Bengal Converting Services, Inc. ('Bengal') as the employer, and Ryan Gibney ('Gibney') as the employee (the 'Employment Agreement'), whereby in the Employment Agreement Gibney was deprived of his rights as an employee-at-will because after his employment was terminated by Bengal, Gibney was not allowed to work in his chosen field of employment for which he was skilled and trained, despite the passage of almost eighteen months from when Bengal terminated Gibney's employment, and thus Gibney was stripped of his employment-at-will rights under common law."

The validity of restrictive covenants in employment agreements has been long recognized in Pennsylvania. These covenants change whatever "rights" an employee at will may have. The employer has the right to protect by covenant its interest in customer goodwill acquired through the efforts of its employees. *Sidco Paper Company v. Aaron*, 465 Pa. 586, 351 A.2d 250, 252-253 (1976). The Supreme Court in *Sidco* held that restrictive covenants in an agreement incident to the employment relationship, reasonably limited in time and geography are valid. The business of the employer in *Sidco* was the purchase and sale of odd lots of printing paper. *See also*, *Bell Fuel Corporation v. Cattolico*, 375 Pa. Super. 238, 544 A.2d 450 (1988); *Jacobson & Company v. International Environment Corp.*, 427 Pa. 439, 235 A.2d 612 (1967).

There is no dispute that this agreement was incident to the employment relation-

5

ship and reasonably limited in time and geography. Mr. Gibney entered into an agreement that modified his common law employment at will rights. Such an agreement is valid in Pennsylvania. The assertion in this issue that Mr. Gibney's employment terminated 18 months before his firing is incorrect, and will be addressed under the next issue.

**Issue No. 2:** "The Court erred by enforcing the Employment Agreement for two years forward from May 15, 2015, and failed to conclude that Gibney's employment by Bengal was terminated by Bengal on December 31, 2013 when Bengal removed Gibney from its payroll, and thereafter Gibney was paid as a subcontractor by Monterey Leasing LP, and issued an IRS Form 1099 for his services."

Several provisions of the employment agreement are pertinent to this and other issues raised. The agreement is titled "**EMPLOYEE AGREEMENT AS TO CONFIDENTIALITY, NON-COMPETITION AND RELATED TERMS OF EMPLOYMENT**" and opens with:

"THIS NON-COMPETITION AND CONFIDENTIALITY AGREEMENT (the 'Agreement') is made and entered into as of this 16th day of September, 2014, by and among BENGAL CONVERTING SERVICES, INC. ('BCS'), a Pennsylvania corporation, BENGAL CONVERTING LP, BENGAL DIRECT, LLC and their respective shareholders, general partners, limited partners, managing members and affiliates of all the foregoing (together with BCS, the 'Company') and Ryan Gibney ('Employee')."

These terms are pertinent:

Under I, A.:

". . . Employee shall devote his full business time and effort to the business of the Company."

Under II, B.(a):

"The Company shall be entitled to the full protection of any and all trade secret and commercial confidentiality laws now or hereafter in effect without regard to any other provisions of this Agreement, and Employee hereby acknowledges that he is bound by all such statutory and common law duties. In addition

6

thereto, in the performance of his duties for the Company, Employee will have access to confidential records and information, including, but not limited to, technical, development, marketing, purchasing, organizational, strategic, financial, managerial, and administrative date or knowledge, *customer and sales information*, rate schedules, rate quotations, work orders, order specification, *pending orders from customers, the names addresses, telephone numbers, credit terms and nature of services provided to customers* . . . (collectively, the 'Confidential Information'). . . . Except in the performance of his duties to the Company or any related entity, *Employee shall not knowingly, direct or indirectly for any reason whatsoever, disclose or use any such Confidential Information* . . ." [emphasis added]

Under II, C.:

"Covenant Not to Compete. The employee hereby agrees that, during the Term of this Agreement and for a period of two (2) years following the termination of his employment with the Company . . . the Employee shall not, within a two hundred (200) mile radius of any business location of the Company engage or invest in . . . be employed by, lend his name to . . . render services or advice to any business that provides services or products that compete with the business then being conducted by the Company . . ."

Under II, D.:

"Non-Solicitation. Employee acknowledges and agrees that business relationships and good will that the Company has developed with customers, through the Company's agents and employees, are of vital importance to the business, operations and success of the Company, and that the Company devotes and has devoted substantial time and money to developing and maintaining those relationships. Therefore, while Employee is performing services for the Company and for the Post-Employment Restricted Period following separation from service, Employee shall not directly or indirectly, for his own account or benefit or for the account or benefit of any other person or entity, solicit, persuade, or induce any person or entity which is or at any time during the 12 months prior to separation from service a customer of the Company or any related entity, or to become a customer of or enter any business relations with Employee or any other person or entity with which he shall become associated in any capacity with respect to the purchase of products or services similar or identical to, in replacement of or competitive with such products and services of the Company or any related entity. These non-solicitation restrictions shall apply to persons or entities with which Employee either had personal contact with such person or entity during and by reason of the employee's employment with the Company or supervised the individuals(s) who had responsibility for maintaining the customer' relationship with Company."

7

Under II. F.:

> "Non-Disparagement. The Employee hereby agrees that during the term of his employment with the Company, and for three (3) years thereafter, he will not directly or indirectly disparage the Company or disseminate . . . negative statements regarding the Company . . . nor shall Employee engage in any conduct or make any other statement that could reasonably expected to impair the good-will, or the reputation or marketing of the Company . . ."

This alleged error can only be supported by Mr. Gibney's assertion that his employment with Bengal Converting was terminated when he began to be paid by Monterey as an independent contractor. This assertion is factually and legally incorrect. First, the court found that Mr. Gibney remained an employee of Bengal Converting even though his salary was reported on a form 1099 from Monterey. Second, Monterey is an "affiliate" of Bengal Converting, making it a party through the agreement's definition of "Company".

Mr. Gibney focuses on the fact a form 1099 was used to report payments to him. This is not a dispositive fact, and will not control when other factors suggest an employment relationship. *Kurbatov v. Department of Labor and Industry*, 29 A.3d 66 (Pa. Cmwlth. 2011) (installers of installation found to be employees in spite of written contracts saying they were contractors and the use of Forms 1099, when the employer supplied some of the materials and fixed the hours of employment); *Hartman v. Unemployment Compensation Board of Review*, 39 A.3d 507 (Pa. Cmwlth.) *allocatur denied*, 671 Pa. 642, 54 A.3d 350, 351 (2012) (videographer an employee for unemployment compensation purposes when employer supplied the video equipment and a uniform even though the employee was given a 1099 and could refuse projects).

Here, Mr. Gibney was required to work fixed hours from Bengal Converting's place of business. Bengal Converting supplied a car, a cell phone and a computer, all of which he used to do his job. As a matter of fact and law, Mr. Gibney was an employee of Bengal

8

Converting, Inc. until he was fired on February 16, 2015. Even if his status was changed to that of a contractor restrictive covenants continue to be effective when an employee changes to an independent contractor. *Quaker City Engine Rebuilders, Inc. v. Toscano*, 369 Pa. Super. 573, 535 A.2d 1083 (1987)

> **Issue No. 3:** "The Court erred in enforcing the non-compete provisions in the Employment Agreement beyond the scope of the restrictions contained in the Employment Agreement that, among other things, only limited Gibney's employment within 200 miles of Bengal's business location."

Mr. Gibney has a point here. The order furnished by Bengal Converting did not limit the prohibition on competition contained in its paragraph a. to 200 miles of Bengal's business location, and it should have. This court is restricted by Pa.R.A.P. 1701(a) from changing its order at this time, but the Superior Court should modify paragraph a. of the order to add at the end of the sentence "within 200 miles of any business location of Bengal Converting." This does not affect the prohibition against soliciting Bengal's customers, who might be anywhere.

Mr. Gibney failed to specify what he includes "among other things" in this issue. Failure to include an issue in a Statement of Errors Complained of when ordered to do so pursuant to Pa.R.A.P. 1925(b) is a waiver of those issues. Both the trial court and the appellate court are impeded in the preparation of an opinion, preventing meaningful and effective appellate review. *Commonwealth v. Lord*, 553 Pa. 415, 719 A.2d 306, 308 (1998). A finding of waiver is required when the Statement is not filed, and is discretionary when it is filed late. *Commonwealth v. Smith*, 854 A.2d 597, 599-600 (Pa. Super. 2004). The court assumes Mr. Gibney is referring to other alleged error he asserts in his Statement of Errors Complained of,

9

and those are addressed elsewhere in this Opinion.

**Issue No. 4:** "The Court failed to conclude that Bengal materially breached the Employment Agreement with Gibney because Bengal failed to pay Gibney the compensation to which Gibney was entitled under the terms of the Employment Agreement, and Bengal was thereby barred from equitable relief."

Mr. Gibney continued to work for Bengal Converting following the reduction in salary without asserting a breach. The failure to assert a breach of contract waives that breach. *Walnut-Juniper Company v. McKee, Berger & Mansueto, Inc.*, 236 Pa. Super. 1, 344 A.2d 549, 552 (1975) (*en banc*). Accepting a reduction in wages raises a presumption an employment contract was changed with regard to those wages. *Wagoner v. City of Philadelphia*, 215 Pa. 379, 64 A. 557 (1906). Finally, paragraph IV. A. of the Agreement provides in its last sentence:

"No breach or alleged breach of this Agreement shall limit the enforcement of the agreements or restrictions contained in Articles II and III of this Agreement."

**Issue No. 5:** "The trial court incorrectly concluded that Gibney engaged in competition with Bengal when Gibney sold paper for Edgewood Paper Company, which is not in competition to Bengal, and the trial court failed to determine which business entities were competitors of Bengal for purposes of Enforcement of the Employment Agreement."

This is a two part issue. As explained in the Findings of Fact Edgewood is a competitor of Bengal Converting. This is a factual finding, and the standard of review on appeal from a preliminary injunction is not to inquire into the merits but to examine the record only to determine if any apparently reasonable grounds for actions of lower court exist. *Sidco Paper Company v. Aaron*, 465 Pa. 586, 351 A.2d 250, 257 (1976).

The court finds no authority for the proposition that a preliminary injunction against competition must name the customers. Not only is this a matter for enforcement, naming

10

the customers would only help the former employee compete.

**Issue No. 6:** "The trial court erred by deciding that the experience, knowledge and skill obtained by Gibney as a result of his employment by Bengal were trade secrets and confidential information that belonged to Bengal, and entitled to protection as Confidential Material under the terms of the Employment Agreement."

Again, this is involves a factual finding, which is supported by the evidence. Mr. Gibney asserted customer information could be found by a Google® search, but the evidence established Mr. Gibney would not have been able to "get in the door" without the information and relationships he obtained from his employment. *Sidco Paper Company v. Aaron*, 465 Pa. 586, 351 A.2d 250, 257 (1976).

**Issue No. 7:** "The trial court committed an abuse of discretion by granting an injunction because there was no evidence Bengal would suffer immediate and irreparable harm that could not be adequately compensated by damages.

**Issue No. 8:** "The trial court committed an abuse of discretion by granting an injunction because there was no evidence Bengal would suffer greater injury if the injunction were not granted than Gibney would suffer if the injunction were granted.

**Issue No. 9:** "The trial court committed an abuse of discretion by granting an injunction because Bengal failed to prove the right to relief was clear, that the wrong was manifest, and that Bengal was likely to prevail on the merits.

**Issue No. 10:** "The trial court committed an abuse of discretion by granting an injunction because Bengal failed to prove the injunction would not adversely affect the public interest when Gibney was rendered unable to work in his chosen field anywhere, and Gibney may require public assistance to support his family which includes special need dependents.

**Issue No. 11:** "The trial court erred by concluding that enforcement of the restrictive covenants was reasonably necessary to protect the business interests of Bengal."

11

These are the usual factors that must be found for a preliminary injunction to issue. As explained below, they are modified when breach of covenants in an employment agreement is sought to be enjoined.

Mr. Gibney offered no credible evidence of his future need for public assistance, and, as the injunction should be modified (see discussion at issued 3, above), he may sell paper outside the 200 mile radius of Bengal Converting if he does not solicit its customers where ever they may be, or any printing or publishing company within the 200 miles. He was not prohibited from working in his prior occupation as a bartender, or in any other business or profession not involving the sale of paper products to printers and publishers. He had no specialized training other than through his three years at Bengal Converting. Again, this is a factual finding. *Sidco Paper Company v. Aaron*, 465 Pa. 586, 351 A.2d 250, 257 (1976).

Equity may enforce a restrictive covenant when it is incident to the employment relationship, which it is here, when reasonably necessary to the protection of the employer, and reasonably limited in duration and geographic extent. *Sidco Paper Company v. Aaron*, 465 Pa. 586, 351 A.2d 250 (1976). Where, as here, personal contact between the sales representative and prospective buyers is crucial to success of the business an injunction may issue without reference to the usual preliminary injunction factors. *Jacobson & Company v. International Environment Corp.*, 427 Pa. 439, 235 A.2d 612 (1967). As the Supreme Court explained in *Sidco Paper Company v. Aaron*:

> "'In almost all commercial enterprises . . . contact with customers or clientele is a particularly sensitive aspect of the business. . . . In most businesses . . . as the size of the operation increases, selling and servicing activities must be at least in part decentralized and entrusted to employees whose financial interest in the business is limited to their compensation. The employer's sole or major contact with buyers is through these agents and the success or failure of the firm depends in

12

part on their effectiveness. . . . (t)he possibility is present that the customer will regard, or come to regard, the attributes of the employee as more important in his business dealings than any special qualities of the product or service of the employer, especially if the product is not greatly differentiated from others which are available. Thus, some customers may be persuaded, or even be very willing, to abandon the employer should the employee move to a competing organization or leave to set up a business of his own. . . .

'The employer's point of view is that the company's clientele is an asset of value which has been acquired by virtue of effort and expenditures over a period of time, and which should be protected as a form of property. Certainly, the argument goes, the employee should have no equity in the custom which the business had developed before he was employed. Similarly, under traditional agency concepts, any new business or improvement in customer relations attributable to him during his employment is for the sole benefit of the principal. This is what he is being paid to do. When he leaves the company he should no more be permitted to try to divert to his own benefit the product of his employment than to abscond with the company's cashbox.'

Under our case law, and in view of the factors discussed by Professor Blake, Sidco clearly has a protectible interest in customer goodwill." 351 A.2d at 452-254.

Also, Mr. Gibney agreed to equitable enforcement of these covenants and the facts that support it in paragraph IV. of the Agreement:

## "IV.    INJUNCTIVE RELIEF

A.    Employee recognizes that the agreements and restrictions contained in Articles II and III of this Agreement are essential to protect the business interests and goals of the Company and that violation of the agreements or restrictions therein will cause irreparable harm to the Company and its shareholders/members for which there is no adequate remedy at law. Employee agrees that the restrictions set forth in this Agreement are reasonable, proper and necessitated by legitimate business interests of the Company and do not constitute an unlawful or unreasonable restraint upon Employee's ability to earn a livelihood. . . . Employee further agrees that, should he violate any of the agreements or restrictions set forth herein, the Company shall be entitled to seek special, preliminary and permanent injunctive relief, as well as any other rights, remedies and damages to which it shall be entitled. . . . Both parties waive any requirement for the posting or securing of any bond in connection with the attainment of any such injunctive or other equitable relief. No breach or alleged breach of this Agreement shall limit the enforcement of the agreements or restrictions contained in Articles II and III of this Agreement."

13

The preliminary injunction, as it should be modified, as explained above, was supported by the evidence, the law and the parties' agreement. That order should be affirmed.

BY THE COURT:

_____
Calvin S. Drayer, Jr., S.J.

Copies of this opinion served on
July ϡ ϡ 2015

By first class mail on:

Douglas T. Gould, Esquire
Gerald S. Berkowitz, Esquire

By interoffice mail on:

Court Administration - Equity/Emergency
Court Administration - Civil

_____
Margaret A. Carter, Secretary

14