656 A.2d 1378

**The Estate of Rose K. LAKATOSH, Deceased, As Successor in Interest of the Estate of Rose K. Lakatosh, An Alleged Incompetent,**

**Appeal of Roger JACOBS.**

Superior Court of Pennsylvania.

Argued Feb. 8, 1995.

Filed April 13, 1995.

134

Dennis S. Hudak, Bethlehem, for appellant.

Dean C. Berg, Northampton, for appellee.

Before CIRILLO, OLSZEWSKI and HESTER, JJ.

CIRILLO, Judge:

This is an appeal from an order of the Court of Common Pleas of Northampton County denying Roger Jacob's post-trial exceptions. We affirm.

This matter involves the finances of an elderly woman, Rose K. Lakatosh (Rose), and the scurrilous motives and actions of a man, Roger Jacobs (Roger), who sought to take advantage of the confidential relationship he developed with Rose so as to siphon money from her for his own benefit. On August 10, 1990, Donald F. Spry, II, Guardian of the Estate of Rose K. Lakatosh, deceased, filed a Petition for an Accounting and Imposition of a Constructive Trust on Roger Jacobs. On March 3, 1993, Spry filed a petition seeking revocation of Rose's last will and testament, dated November 11, 1988, on grounds of undue influence. A non-jury trial was held before the Honorable F.P. Kimberly McFadden on March 16–18, 1993. On December 30, 1993, it was ordered that a constructive trust in the amount of $128,565.29 be imposed on Roger, and that Rose's will dated November 11, 1988 be revoked.

Roger filed timely post-trial exceptions to the trial court's decision of December 30, 1993. Roger now appeals from the denial of his post-trial exceptions. On appeal, in his statement of questions involved, Roger has raised thirty-one (31) allegations of error on the part of the trial court which span four pages and consist of ninety-seven (97) lines. This is an egregious violation of the rules of appellate procedure. Rule 2116(a) of the Pennsylvania Rules of Appellate Procedure provides:

The statement of questions involved ... should not ordinarily exceed 15 lines, must never exceed one page, and must always be on a separate page, without any other matter appearing thereon. This rule is to be considered in the highest degree mandatory, admitting of no exception[.]

Pa.R.A.P. 2116(a). When a party's brief fails to conform with the requirements of the rules of appellate procedure and the discovered defects are substantial, this court may, in its discretion, quash or dismiss the appeal pursuant to Rule 2101 of the rules of appellate procedure. *See* Pa.R.A.P. 2101. Presently, Roger's nonconformance with the requirements of the Pennsylvania Rules of Appellate Procedure are substantial and, therefore, permit dismissal of this appeal.[1]

Although we choose not to dismiss this appeal, we admonish Roger and his counsel for this flagrant disregard of the rules of appellate procedure and caution that future violations will not be handled quite so tolerantly. What Roger's counsel must understand, as well as all those who come before an appellate court, is that his is not the only case which needs to be heard and if we are to do the best job we can in providing efficient and equitable relief, then all appellate counsel must

1. Moreover, we note that it has been held that when an appellant raises an extraordinary number of issues on appeal, as in this case, a presumption arises that there is no merit to them. In *United States v. Hart*, 693 F.2d 286, 287 n. 1 (3rd Cir.1982), the court had an opportunity to address this situation:

Because of the inordinate number of meritless objections pressed on appeal, spotting the one bona fide issue was like finding a needle in a haystack. One of our colleagues has recently cautioned on the danger of "loquaciousness:"

With a decade and a half of federal appellate court experience behind me, I can say that even when we reverse a trial court it is rare that a brief successfully demonstrates that the trial court committed more than one or two reversible errors. I have said in open court that when I read an appellant's brief that contains ten or twelve points, a presumption arises that there is no merit to any of them. I do not say that this is an irrebuttable presumption, but it is a presumption nevertheless that reduces the effectiveness of appellate advocacy. Appellate advocacy is measured by effectiveness, not loquaciousness.

Aldisert, *The Appellate Bar: Professional Competence and Professional Responsibility—A View From the Jaundiced Eye of One Appellate Judge*, 11 Cap.U.L.Rev. 445, 458 (1982).

adhere to the rules which allow this court system to function efficiently and fairly.

One of the reasons we decline to dismiss Roger's appeal is that his own actions effectively negate his prior non-conformance with Rule 2116. That is, Roger has only addressed three issues in the argument section of his brief. As a result, all of those issues set forth within his statement of questions involved, which are not addressed in the argument section of his brief, are waived. *Cosner v. United Penn Bank,* 358 Pa.Super. 484, 517 A.2d 1337 (1986) (finding issue waived when no argument in support contained in brief). The three issues which Roger raises is his brief are: [2]

(1) Whether the Appellant acted improperly as the deceased's Power of Attorney and, as a result, improperly converted or caused the deceased to lose her money?

(2) Whether the will of the deceased, dated November 11, 1988, and prepared by a licensed attorney, was valid?

(3) Whether the trial court erred in granting Letters of Administration Pendente Lite for the Estate of the deceased to the deceased's nephew?

■■ With regard to issues one and three, we need not reach the merits of these issues since Roger's argument section pertaining to these issues consists of general statements unsupported by any citation of authority. The argument portion of an appellate brief must include a pertinent discussion of the particular point raised along with discussion and citation of pertinent authorities. Pa.R.A.P. 2119(a). We

---

**2.** This court points out with noted impatience Roger's failure to comply with Rule 2119 of the Pennsylvania Rules of Appellate Procedure, which provides:

> The argument **shall** be divided into as many parts as there are questions to be argued; **and shall** have at the head of each part—in distinctive type or in type distinctively displayed—the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.

Pa.R.A.P. 2119(a). Roger's brief violates Rule 2119(a) because it is not divided into as many parts as there are questions to be argued, nor is the particular point to be addressed set out at the head of each part in distinctive type or distinctively displayed.

decline to become Roger's counsel, and will not consider these issues further.

One issue, therefore, remains for this court's review, namely, whether the trial court erred in finding that Rose's will, dated November 11, 1988, was an invalid testamentary disposition and subject to revocation.

Our standard of review in will contests is well settled:

"Our review in [a will contest] is limited to determining whether the findings of fact approved by the court ... rest on legally competent evidence, and whether an error of law has been made or an abuse of discretion committed." *In Re Estate of Ziel*, 467 Pa. 531, 536, 359 A.2d 728, 731 (1976); *In re Estate of DiPietro*, 306 Pa.Super. 238, 240, 452 A.2d 532, 533 (1982). "It is not our task to try the case anew." *In re Estate of Ross*, 316 Pa.Super. 36, 40, 462 A.2d 780, 782 (1983). "This rule is particularly applicable 'to findings of fact which are predicated upon the credibility of witnesses, whom the judge has had the opportunity to hear and observe, and upon the weight given to their testimony.'" *Estate of Gilbert*, [342] Pa.Super. [82], [87], 492 A.2d 401, 404 (1985) [ ( )quoting *In re Estate of Dembiec*, 321 Pa.Super. 515, 519–20, 468 A.2d 1107, 1110 (1983)[ ) ].

*In re Estate of Bankovich*, 344 Pa.Super. 520, 522–23, 496 A.2d 1227, 1229 (1985).

Rose was a woman in her early to mid seventies in March of 1988 when Roger Jacobs came into her life. Roger introduced himself to Rose by delivering his business card to her at her home in Northampton, Pennsylvania, after which he began to perform odd jobs for Rose. At the time Roger came to know Rose, Rose had no contact with any of her family members except for an occasional visit from her sister, Margaret Berg. Roger had an active relationship with Rose from the spring of 1988 until June of 1990, when a fire partially destroyed Rose's home.

Roger had much contact with Rose after they first met in March of 1988. Roger lived just a few miles from Rose and

visited her at least once a day and sometimes as often as two or three times a day. Roger assisted Rose around her house and drove Rose to various appointments and took her on various errands. These facts suggest that this elderly woman came to depend on Roger as the only person with whom she really had substantial contact. As subsequently discussed at greater length, we agree with the trial court that Roger gained the confidence of Rose. This determination is also supported by Rose's conduct.

In March of 1988, Rose expressed her concern to Roger about a slander lawsuit which had been filed against her by her nephew, Dean Berg. Roger responded to Rose's concerns by contacting his second cousin, Attorney Richard Jacobs, who agreed to be Rose's attorney. Also, in June, 1988, Rose told Roger that she owned some stock and asked Roger to contact Janney Montgomery Scott ("JMS"), a financial investment company, to check on her investments. On several occasions between June of 1988 and November of 1988, Roger took Rose to meet with a representative of JMS to review various stock certificates. Roger was present at these meetings and also actively participated in these meetings.

In the summer of 1988, Roger suggested to Rose that she execute a power of attorney so that she would have someone to care for her should she need it. On November 11, 1988, Rose executed a power of attorney making Roger her attorney-in-fact. On that same date, Rose executed a new will which left all of her estate to Roger, except for a $1,000.00 gift to her church. Both the will and the power of attorney were prepared by Attorney Richard Jacobs and, at that time, he concluded, after conferring with Rose about her will, that she was of sound mind and capable of disposing of her assets. Three days later, however, after the execution of the will, Attorney Jacobs prepared a petition to have Rose evaluated in order to determine if she was competent to assist her counsel in the defense of the slander action. The petition supposedly was Attorney Jacobs' response to Rose's inability to provide information for discovery requests in July of 1988, as well as Rose's inability to remember things and grasp the value of her

stocks or realize their worth in the fall of 1988. In addition, in an answer to a motion for sanctions in the slander action, Attorney Jacobs requested the court not to issue sanctions until Rose could be evaluated to determine her mental capacity to assist her counsel in the defense of the action.

Although Roger was not present in Attorney Jacob's office at the time the will and the power of attorney were executed, Rose informed Roger of the new will and its provisions on the very same day that it was executed. Additionally, Roger obtained several copies of the newly executed power of attorney and delivered these copies to JMS, as well as banks where Rose had savings and checking accounts, namely, Northeastern Bank and Merchants Bank. Roger testified at trial that his understanding of the power of attorney executed by Rose was that it permitted him to liquidate any of her assets as he saw fit, whether for her benefit or not.

On January 5, 1989, Attorney Jacobs, who continued to represent Rose in the slander action, prepared a draft of a letter to the Disciplinary Board of the Supreme Court of Pennsylvania in which he stated that he was retained by Rose to represent her in the slander action and "[i]n the process of the suit it became quite apparent to me that Rose is really not competent to understand the nature of her acts nor at this point do I believe she is competent to handle her own estate." Also, Attorney Jacobs noted that he received responses from Rose like "God will protect me" and "everything will be alright because God will punish him."

Concerning Rose's finances and Roger's power of attorney, Roger unlawfully converted $128,565.29 in assets from Rose's estate for his own benefit or for the benefit of others, not including Rose, from September, 1988 to June, 1990. Among other improper conversions, Roger caused approximately $72,-000.00 of Rose's assets to be transferred to Patricia Fox, a woman who had been friends with Roger since February of 1984, but who was not known by Rose personally.

In June, 1990, Rose was living in squalor and filth and had fallen behind in the payment of certain household bills includ-

ing water/sewer bills, and County and City property taxes. On June 18, 1990 Rose executed a general revocation of the power of attorney placed in Roger Jacobs. On September 4, 1993, Rose died.

Prior to the trial concerning the petition for the imposition of a constructive trust brought by Petitioner Spry, Spry also filed a petition to revoke Rose's will dated November 11, 1988 based on undue influence. The trial court granted Spry's request to revoke the will. We must now determine, in view of the aforementioned facts, whether the trial court committed error or abused its discretion in its application of the law when it found that Rose's will should be revoked. *Bankovich, supra,* 344 Pa.Super. 520, 496 A.2d 1227.

Spry maintains that the will must be revoked because Roger failed to carry his burden of proving the absence of undue influence surrounding Rose's execution of the November 11th will. The court in *Bankovich, supra,* 344 Pa.Super. 520, 496 A.2d 1227, discussed the burden of proof in a case involving the allegation of undue influence:

> The burden of proof in cases of this type is as defined by the Supreme Court in *Estate of Reichel,* 484 Pa. 610, 400 A.2d 1268 (1979). The Court stated:
>
>> When the proponent of a will proves that the formalities of execution have been followed, a contestant who claims that there has been undue influence has the burden of proof. **The burden may be shifted so as to require the proponent to disprove undue influence.** To do so, the contestant must prove by clear and convincing evidence that there was a confidential relationship, that the person enjoying such relationship received the bulk of the estate, and that the decedent's intellect was weakened.
>
> *Id.* at 614, 400 A.2d at 1270. [*Accord*]: *In re Estate of Pedrick,* 505 Pa. 530, 538–39, 482 A.2d 215, 219 (1984); *Estate of Shelly,* 484 Pa. 322, 332, 399 A.2d 98, 103 (1979).

*Bankovich,* 344 Pa.Super. at 523, 496 A.2d at 1229 (emphasis added).

Initially, it must be ascertained whether a confidential relationship existed between Roger Jacobs and Rose Laka-

tosh. A confidential relationship exists "whenever one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other." *Estate of Clark,* 467 Pa. 628, 635, 359 A.2d 777, 781 (1976); *Commonwealth, Dep't of Transp. v. E–Z Parks, Inc.,* 153 Pa.Commw. 258, 267, 620 A.2d 712, 717, *appeal denied,* 534 Pa. 651, 627 A.2d 181 (1993). It has also been held that:

> Although no precise formula has been devised to ascertain the existence of a confidential relationship, it has been said that such a relationship is not confined to a particular association of parties, but exists whenever one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest.

*Estate of Buriak,* 342 Pa.Super. 371, 373, 492 A.2d 1166, 1167 (1985) (quoting *Estate of Keiper,* 308 Pa.Super. 82, 82, 454 A.2d 31, 33 (1982)).

Further, the existence of a power of attorney given by one person to another is a clear indication that a confidential relationship exists between the parties. *Foster v. Schmitt,* 429 Pa. 102, 239 A.2d 471 (1968); *Hera v. McCormick,* 425 Pa.Super. 432, 448–49, 625 A.2d 682, 691 (1993). In fact, "[n]o clearer indication of a confidential relationship [can] exist than giving another person the power of attorney over one's entire life's savings." *Bankovich,* 344 Pa.Super. at 524, 496 A.2d at 1229 (citations omitted). "This is particularly true[ ] when the alleged donee is shown to have spent a great deal of time with the decedent or assisted in decedent's care." *Hera,* 425 Pa.Super. at 449, 625 A.2d at 691.

The trial court properly concluded that the testimony at trial indicated that a confidential relationship existed between Rose and Roger. The facts illustrate that from the time Roger came to know Rose he developed a close relationship with her which included her confiding in him about her legal problems as well as her financial affairs. Since Rose had very little contact with other individuals, she became dependent

upon Roger's assistance in her everyday life. Roger developed a confidential relationship with Rose since he occupied a position towards Rose as an advisor, counselor and confidant, and inspired Rose's confidence that he would act in good faith for her interests. *Clark, supra,* 467 Pa. 628, 359 A.2d 777; *Buriak, supra,* 342 Pa.Super. 371, 492 A.2d 1166. Such a finding is especially true here as Roger spent a great deal of time with Rose and assisted in her care. Also, all of this occurred even before Rose made Roger her power of attorney which, in and of itself, is sufficient for a finding that a confidential relationship existed. *Foster, supra,* 429 Pa. 102, 239 A.2d 471; *Hera, supra,* 425 Pa.Super. 432, 625 A.2d 682; *Bankovich, supra,* 344 Pa.Super. 520, 496 A.2d 1227. Furthermore, Roger admitted, both in his answer to Spry's petition and in his brief on appeal, that he had gained the confidence of Rose.

■ Next, Spry, as contestant of the will, needed to prove that the person enjoying the confidential relationship received the bulk of the estate. On November 1, 1988, the date of the will's execution, the value of Rose's estate amounted to $268,-672.11. Since Roger was to receive all of Rose's estate, except for the $1,000.00 gift to her church, it is without question that Roger was to receive the bulk of Rose's estate.

Lastly, it must be ascertained whether Rose suffered from a weakened intellect at the time the will was executed. Concerning this issue, we have stated that:

> [t]he "weakened intellect" which must be shown in order to establish a prima facie case of undue influence upon the testator need not amount to testamentary incapacity. Although testamentary capacity is to be determined by the condition of the testator at the very time he executes a will, evidence of incapacity for a reasonable time before and after the making of a will is admissible as an indication of lack of capacity of the day the will is executed.

*Burns v. Kabboul,* 407 Pa.Super. 289, 308, 595 A.2d 1153, 1163 (1991), *appeal denied,* 529 Pa. 655, 604 A.2d 247 (1992) (citations omitted). Moreover, the Pennsylvania Supreme Court has stated that "[u]ndue influence is generally accomplished by a gradual, progressive inculpation of a receptive mind. The 'fruits' of the undue influence may not appear until long

after the weakened intellect has been played upon." *Banko-vich*, 344 Pa.Super. at 525, 496 A.2d at 1230 (quoting *In re Estate of Clark*, 461 Pa. 52, 65, 334 A.2d 628, 634 (1975)).

It matters not that Attorney Jacobs determined that Rose had the testamentary capacity to dispose of her estate on the day she executed her will, as a weakened intellect is distinguishable from testamentary incapacity. *Burns, supra*, 407 Pa.Super. 289, 595 A.2d 1153. "[W]eakened mentality as relevant to undue influence need not amount to testamentary capacity ... for the particular mental condition of the testatrix on the day she executed the will is not as significant when reflecting upon undue influence as it is when reflecting upon testamentary capacity." *In re Estate of Clark*, 461 Pa. at 65, 334 A.2d at 634. Our review of the record reveals that there is ample evidence to support the trial court's finding that Rose had a "weakened intellect" at the time she executed the November 11, 1988 will.

Although Roger testified that Rose was in good physical and mental health on the day the will was executed and that he had no difficulty communicating with her, he also testified that, around the time of the will's execution, Rose had trouble remembering things and had no understanding of her estate or assets. Significantly, it was Roger himself who suggested that Rose execute a power of attorney so that someone could help her if it was necessary. According to Roger's testimony, he was concerned with Rose's susceptibility to being taken advantage of, and it was this concern which sparked the idea for the power of attorney.

Moreover, the representations made by Attorney Jacobs in the pleadings and correspondence in the slander suit questioning Rose's competence and ability to understand her estate also indicate that her intellect was weakened at the time the will was executed. Although the mental evaluation requested by Attorney Jacob's was never actually conducted, his concern three days after the will's execution that Rose lacked the mental capacity to meaningfully participate in the lawsuit is evidence of her weakened intellect three days before. Additionally, less than two months after Rose signed the will, Attorney Jacobs drafted a letter questioning Rose's ability to

understand the nature of her actions and handle her own estate.

Further, an audio tape, which had been made of a conversation between Rose and Attorney Jacobs on the day the will was executed, also evidences the notion that Rose suffered from a weakened intellect at the time. Attorney Jacobs testified at trial that, because Roger was to receive the bulk of Rose's estate and was not her blood relative, he thought it wise to make the tape as evidence of the will's validity, should it be challenged. Instead of reinforcing the integrity of the will, the audio tape supports the proposition that Rose suffered from a weakened intellect.

The audio tape revealed that Rose was easily distracted and clearly had difficulty remaining focused on the issue of the will. Also, as pointed out by the trial court, even though Attorney Jacobs repeatedly attempted to re-direct Rose's attention to the issue of the will, she could not remain focused or coherent. Rose made several comments on the tape which indicate that she had a weakened intellect and that she was somewhat out of touch with reality. Specifically, Rose referred to Roger as "an angel of mercy" who "saved her life" because, before she met him, she had been "so low in hell." Rose also repeatedly claimed that her nephew, Dean Berg, threatened to rob and kill her and that he was persecuting and torturing her.

Finally, proof of Rose's weakened intellect can be seen in the state in which she was living. That is, she was an elderly woman; helpless and unable to prevent the consumption of her assets by Roger during the period before and after the execution of her will, from September, 1988, to June, 1990, when she finally had Roger's power of attorney revoked. Also, Rose was living in filth in the spring of 1990, with her bills not having been paid, and, after a house fire, it was discovered that her house was in shambles with trash throughout and dead cats found in her freezer and bathtub.

All of this goes to establish that Rose suffered from a weakened intellect at the time the November 11, 1988 will was

executed. As a result, the burden of disproving undue influence shifted to Roger. *Burns, supra,* 407 Pa.Super. 289, 595 A.2d 1153; *Bankovich, supra,* 344 Pa.Super. 520, 496 A.2d 1227. "Once the burden of disproving undue influence shifts to the proponent [of the will], it is incumbent upon the proponent to demonstrate the absence of undue influence by clear and convincing evidence." *Burns,* 407 Pa.Super. at 307, 595 A.2d at 1163 (citations omitted).

Consequently, we conclude that the trial court's findings rest on legally competent evidence and the trial court did not commit error or abuse its discretion in finding that Rose's will should be revoked because Roger failed to carry his burden of proving the absence of undue influence. *Bankovich, supra,* 344 Pa.Super. 520, 496 A.2d 1227; *see also Matter of Estate of Evasew,* 526 Pa. 98, 104, 584 A.2d 910, 913 (1990) (holding that "[w]hen the relationship between persons is one of trust and confidence, the party in whom the trust and confidence are reposed must act with scrupulous fairness and good faith in his dealings with the other and refrain from using his position to the other's detriment and his own advantage").

Order affirmed.