**In re Schell**

*Steven V. Manbeck,* for Elmer C. Schell.
*Ralph Germak,* for petitioners.
*Charles Friedman,* for respondents.

REHKAMP, *J.,* December 12, 1995—By order dated December 8, 1995, this court found that Elmer C. Schell was an incapacitated person from May 18, 1993 continuously until the date of the order and additionally found that the documents executed by Elmer C. Schell, being a will and power of attorney, were null and void because of his legal incapacitation. The order also indicated that a memorandum shall follow in due course and this is the said memorandum.

The legal definition of "incapacitated person" under the applicable statute is

"An incapacitated person means an adult whose ability to receive and evaluate information effectively and communicate decisions in any way is impaired to such

a significant extent that he is partially or totally unable to manage his financial resources or to meet essential requirements for his physical health and safety."

This court was particularly impressed with the testimony of Dr. Lynn Gerald Guiser, whose testimony commences at page 81 of the transcript dated June 29, 1994 and extends to another transcript dated August 23, 1994. In particular, this court was impressed with the fact that Dr. Guiser has 25 years experience as a doctor and particularly 10 years experience with Elmer Schell, who at the time of his diagnosis of "incapacity" dated May 8, 1993 was 81 years of age. Dr. Guiser then explained the deterioration of his physical and mental abilities, which he observed over the course of 10 years, and more recent incidents of inappropriate conduct and delusional states of mind which are interspersed sporadically with periods of some lucidity.

Dr. Guiser explains the lucid moments, which may have been observed by some of the other witnesses called in this case, at page 96 of the transcript dated June 29, 1994, line 20, in describing an interview he had with Elmer Schell on the date of his diagnosis of May 18, 1993 in his office with another individual being present as follows:

"First of all, I made sure he could hear me when I asked a question. I have noted on here he has a hearing loss. It was not a matter that he could not hear me, but his comprehension of what I was telling him and what was going on, seemed lacking. He was looking at another individual or me and his answer would be, 'Whatever you say.' He did not seem to have appropriate insight into his failing health, his poor memory, his poor nutrition; and I told him directly, very close, speak-

ing loudly into his ear, that I thought placement in a home-type facility was the best for his own health and the health and safety of others."

This first diagnosis and prediction of what was best for Elmer Schell turned out to be accurate when viewing the incidents that occurred subsequent thereto. Specifically, this court recalls testimony from various sources concerning his hospitalization at Lewistown Hospital following an incident that occurred at the intermediate care facility at Brookline Nursing Home, which resulted from acting out behavior basically being delusional episodes wherein he felt that he was at home, went through items of personal property in other patients' rooms, acted out sexually with female workers and on one occasion was looking for his wife who had been deceased for several years. Elmer Schell was subsequently placed in the more secure unit of the Brookline Nursing Home and upon release from the nursing home, through the efforts of Attorney Richard Friedman and Carol Waite and her husband, spent several weeks in their home and then had to be hospitalized at Hershey Medical Center and finally at Messiah Village Nursing Home where he presently is housed. The Waites apparently learned firsthand of his bizarre behavior when he called Mrs. Waite his wife and told Mr. Waite to leave his home, which in reality was the Waites' home.

This court also had the opportunity to observe Elmer Schell firsthand at two hearings, one of which was scheduled within a month of the execution of the documents complained of, which hearing date was October 8, 1993, and this court recalls that Mr. Schell was confused and disoriented; and at the second proceeding which, I believe, was held on June 29, 1994, Mr. Schell was wandering around the courtroom, could not stay

508

seated for any length of time, looked out the window and finally was asked to leave the courtroom. My opinion of him after those two hearings was that he exhibits child-like behavior at times, he may be lucid at times, but has no real ability to make important decisions in his life, such as changing his will or power of attorney.

I have also reviewed the testimony of Dr. Zimmerman who also indicated among other things that Mr. Schell exhibits some periods of lucidity. However, this court finds as a fact that the testimony of Dr. Lynn Guiser, Mr. Schell's family doctor for 10 years, is more persuasive and also corresponds to the impression of Mr. Schell made by this court.

At all times relevant to the documents which were prepared by Richard Friedman as attorney for the Waites and also as attorney for Mr. Schell, being September 15, 1993 which was the date of execution of the documents by Mr. Schell and also on October 15, 1993 which was the date of ratification of said documents by Mr. Schell in the presence of Mr. Friedman and Dr. Zimmerman, who testified on behalf of the Waites; this court is satisfied that Mr. Schell was subject to undue influence and therefore not capable of executing the documents in question. In the transcript, the testimony of Dr. Zimmerman, the Waites' expert witness, at page 88 of said transcript of testimony dated June 21, 1994 in answer to a question from Mr. Manbeck who was appointed attorney for Mr. Schell at line 16, the doctor was asked:

"Again, speaking to layman's observations, if a layperson were to observe Mr. Schell, I'm addressing this more back in the October area, if a layperson were to observe Mr. Schell in one of his lucid periods, does that necessarily mean that Mr. Schell would have—by virtue of being lucid at the time, would he have been

able to appreciate the consequences of his acts that he was taking?

"Answer: Not necessarily, no."

Even though Dr. Zimmerman testified that he felt Mr. Schell knew what he was doing when he signed the will and power of attorney, this court rejects that opinion as unfounded based upon the history of Mr. Schell's mental and physical condition as outlined in the various hearings held in this matter.

This court is satisfied that regardless of whether Mr. Schell's estate was worth $50, $500,000 or $5,000,000, he would have willed it over to anyone willing to take him out of Brookline Nursing Home on September 15, 1993. He expressed a desire to die if he would stay in a nursing home and the Waites offered him their home only after he signed his estate over to them totally and completely.

This court also finds that this case illustrates the need for the legislation that was enacted to prevent unscrupulous people from taking advantage of our elderly citizens who, through dementia, have lost their ability to appreciate the consequences of their actions. If Mr. Schell had known that he would be back in a nursing home within several weeks of the execution of the will and power of attorney to the Waites and his release from Brookline Nursing Home, he certainly would have revoked the will and power of attorney at this point in time if he were not mentally impaired.

This court finds as a fact that the Waites and Attorney Richard Friedman acting upon their own interests exerted undue influence upon Elmer Schell in executing the will and power of attorney turning over his $500,000 estate to the Waites in consideration of them offering him a home. According to the case of *Estate of Lakatosh,* 441 Pa. Super. 133, 656 A.2d 1378 (1995), this court

finds that there is clear and convincing evidence that there was a confidential relationship, that the persons enjoying such relationship received the bulk of the estate and that the decedent's intellect was weakened. According to the reasoning in said case, the burden then shifts to the proponent of the will and power of attorney to disprove undue influence. The Waites, through their testimony, the testimony of their expert witness and the witness to the will and power of attorney, have failed to meet their burden. Therefore, the will and power of attorney are declared null and void.

## ORDER

And now, December 8, 1995, after review of the transcripts of the various hearings held in this matter, the written argument of counsel of record and the applicable case law and statutory law, this court finds as a fact that the said, Elmer C. Schell, has been incapacitated, in accordance with the definition in the applicable statute, since May 18, 1993, which was the initial determination by his family physician, Dr. Guiser, continuously until the date of this order.

Additionally, this court finds that the documents executed by Elmer C. Schell in the presence of the Waites' attorney, Richard Friedman, who was also acting as counsel for the said Elmer C. Schell at the time, are null and void as this court specifically finds that Elmer C. Schell was legally incapacitated at said time and in addition thereto, that the reason Mr. Schell executed said documents was so that he could go live with the Waites in their home and leave the nursing home as he had indicated previously that he would rather be dead than to live in a nursing home.

It is hereby ordered and directed that a corporate guardian shall be appointed in this matter, being the

First National Bank of Mifflintown, who shall have the authority to gather the assets of the said, Elmer C. Schell, require and obtain an accounting from Richard Friedman and the Waites during the period of time from the handling of the documents by the Waites and Mr. Richard Friedman forward. No bond shall be required for said guardian appointment.

A memorandum shall follow in due course.