J-A06018-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

IN RE: ESTATE OF PATRICIA HENNINGER

APPEAL OF: ESTATE OF PATRICIA HENNINGER

: IN THE SUPERIOR COURT OF PENNSYLVANIA

: No. 816 WDA 2025

Appeal from the Order Entered June 6, 2025
In the Court of Common Pleas of Crawford County Orphans' Court at
No(s):  OC-2024-0090

BEFORE:  OLSON, J., MURRAY, J., and BECK, J.

MEMORANDUM BY MURRAY, J.:                **FILED: April 9, 2026**

The Estate of Patricia Henninger (the Estate) appeals from the orphans'

court order denying and dismissing, with prejudice, its petition for citation for

an account and the return of money.[1]  After careful review, we affirm.

Patricia Henninger, deceased (Decedent), "was a generous person with

a substantial estate who would frequently make gifts.  [] Decedent gave away

---

[1] The Commonwealth of Pennsylvania, represented by the Pennsylvania Attorney General, also participated in the underlying proceedings as *parens patriae*, because the Estate's assets include a charitable trust.  **See** 20 Pa.C.S.A. § 7735(c) (permitting the Attorney General to bring a proceeding to enforce a charitable trust).  The Commonwealth filed a separate petition for citation, which the orphans' court denied and dismissed in the same order. We separately address the Commonwealth's appeal at 817 WDA 2025.

large sums of money to churches, schools, scholarships, animal shelters, and individuals." Orphans' Court Opinion, 6/6/25, at 1.

As Decedent's relationship with Robert Bazylak, M.D. (Dr. Bazylak), is central to this appeal, we recount that relationship. "Dr. [] Bazylak met [] Decedent through their church in the early 2000's. He eventually became her physician." *Id.*

In 2004, Decedent established the Carl E. Henninger Foundation (the Foundation) in honor of her late husband. *See* N.T., 6/3/25, at 14. Decedent appointed Dr. Bazylak as a trustee of the Foundation. *See id.*

On November 10, 2016, Decedent executed a limited power of attorney, appointing Dr. Bazylak as her agent. Dr. Bazylak subsequently accepted the appointment. However, Dr. Bazylak "never acted as [Decedent's] agent at any time." Orphans' Court Opinion, 6/6/25, at 2.[2]

"In 2017, when [] Decedent was approximately 87 years old[, ] Decedent often went to dinner with Dr. Bazylak and his wife. Dr. Bazylak would take [] Decedent meals and checked in on her...." *Id.* at 2.

The orphans' court summarized the three payments Decedent made to Dr. Bazylak, which are at issue in this appeal:

> In 2017, Decedent became aware that Dr. Bazylak wanted to establish a rehabilitation and recovery facility[,] and Decedent wanted to fund that endeavor. On August 10, 2017, [] Decedent

---

[2] According to the averments in the Estate's petition for citation, Dr. Bazylak ceased being Decedent's limited power of attorney in 2021. Estate's Petition for Citation, 8/12/24, ¶ 8.

wrote a check to [Dr.] Bazylak in the amount of $1,000,000. Dr. Bazylak used the money to purchase property to establish the rehabilitation facility. On July 20, 2018, [] Decedent wrote a check to [Dr.] Bazylak in the amount of $200,000. Dr. Bazylak used the money for costs and expenses of the rehabilitation facility. On October 8, 2019, [] Decedent wrote a check to [Dr.] Bazylak in the amount of $1,000,000. This money was also used to pay costs and expenses of the rehabilitation facility. Decedent never intended to be repaid. Rather, it was Decedent's intention to make gifts to Dr. Bazylak to establish the rehabilitation facility. And Decedent did[,] in fact[,] deliver the three separate checks as gifts to Dr. Bazylak on three separate occasions.[FN]

---

[FN] Although the amounts of these checks may seem high, they are a considerably small percentage of [] Decedent's very substantial estate.

*Id.*

Additionally, the orphans' court made factual findings related to Decedent's mental state during the last several years of her life. The orphans' court found that "Decedent was not confused, weak, or incapacitated in 2017, 2018, or 2019." *Id.*, n.2; *see also id.* at 2 (indicating that Decedent did not exhibit weakness or confusion in 2017). Instead, the orphans' court found that Decedent became confused in approximately "2021[, when she was approximately 91 years old,] or possibly around the COVID period when she became isolated." *Id.*, n.2; *see also id.* at 3 (indicating that during that time, "Decedent became distrusting of the people in her life and began to act erratically and make nonsensical accusations toward others."). Further, just

- 3 -

days before Decedent's death, Colleen Viscusi (Viscusi) was appointed as Decedent's guardian. *Id.* at 2 n.2.[3]

Decedent died testate on February 19, 2024. In her will, Decedent named Viscusi as the executrix of her estate. *See* Exhibit A (Last Will and Testament of Patricia L. Henninger, 8/30/22), § 3.01. Pertinently, Decedent's will provided for distribution of the Estate as follows:

> My Executor will distribute my entire probate estate to the Trustee of the Patricia L. Henninger Living Trust dated June 9, 2004, to hold and administer according to the provisions of that trust.

*Id.*, § 3.04.

Under the terms of the trust, Decedent was the sole named trustee. *See* Exhibit B (Patricia L. Henninger Living Trust, 8/30/22), Art. 1. The trust also named Viscusi as the first trustee in succession following Decedent's death. *Id.*, § 3.03. Generally, the trust dictated that upon Decedent's death, the trust would become irrevocable, and the acting trustee would be "authorized, but not directed" to pay, *inter alia*, expenses related to Decedent's funeral and the expenses of administering the trust and Estate. *Id.*, Art. 5. Significantly, Article Six of the trust provides as follows:

> Upon Settlor's death, the Trustee will distribute the residuary trust estate to [the] Carl and Patricia Henninger Fund, a component fund of the Pittsburgh Foundation of Pittsburgh, Pennsylvania[,] outright, free of trust.

---

[3] Viscusi was also Decedent's financial power of attorney. *See* Exhibit 1 (Financial Power of Attorney, 10/28/21).

*Id.*, Art. 6.

On August 12, 2024, the Estate filed a petition for citation directed to Dr. Bazylak, seeking an accounting for the time during which he served as Decedent's power of attorney. The Estate identified the three checks, all of which Dr. Bazylak received while he held a limited power of attorney. Estate's Petition for Citation, 8/12/24, ¶ 6. The Estate alleged that Dr. Bazylak was in a confidential relationship with Decedent, and that Decedent "was dependent upon [Dr. Bazylak] for assisting her with her financial affairs[,] as well as her physical well-being as … her physician." *Id.*, ¶ 16; *see also id.*, ¶¶ 9, 12. Thus, the Estate requested that Dr. Bazylak (1) file an account for the time he was Decedent's agent; and (2) return all lifetime gifts he received from Decedent. *Id.*, ¶¶ 15-16. The orphans' court issued the citation and directed Dr. Bazylak to respond.

Dr. Bazylak filed an answer and new matter on September 10, 2024. Dr. Bazylak acknowledged that he was Decedent's physician, and that he received gifts from Decedent totaling $2.2 million. Answer and New Matter, 9/10/24, Answer ¶¶ 6-7. However, Dr. Bazylak specifically denied that Decedent was dependent on him financially or otherwise, and he denied having any overmastering influence over Decedent. *Id.*, Answer ¶¶ 12-13. In his new matter, Dr. Bazylak averred that he never exercised any rights or powers while he served as Decedent's attorney-in-fact. *Id.*, New Matter ¶ 8. Further, Dr. Bazylak emphasized Decedent's history of charitable giving and

her intention to help Dr. Bazylak fund his rehabilitation and recovery facility, Snug Harbor Rehabilitation and Recovery (Snug Harbor). ***Id.***, New Matter ¶¶ 10-11. Dr. Bazylak asserted that Decedent did not suffer from weakened intellect or mental deficiencies when she gave him the gifts. ***Id.***, New Matter, ¶ 12.

On February 14, 2024, Dr. Bazylak filed a motion for partial summary judgment. Dr. Bazylak denied exercising any rights or powers during his time as Decedent's attorney-in-fact, and argued that neither the Estate nor the Commonwealth made any allegation that he had made the gifts to himself as Decedent's agent. ***See*** Motion for Partial Summary Judgment, 2/14/24, ¶ 4. Dr. Bazylak asserted that claims for undue influence are subject to a two-year statute of limitations. ***Id.***, ¶¶ 7-14 (citing 42 Pa.C.S.A. § 5524(7) (providing a two-year statute of limitations applies to "[a]ny other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud, except an action or proceeding subject to another limitation specified in this subchapter.")). Dr. Bazylak therefore sought dismissal of the undue influence claims, but did not seek dismissal of the claims seeking an accounting. The Estate did not file a response.

On March 17, 2025, the orphans' court denied Dr. Bazylak's motion for partial summary judgment and scheduled a hearing on the petitions for

citation.   Dr. Bazylak, Viscusi, and Father David Carter (Father Carter)[4] testified during the hearing.   Pertinently, portions of Dr. Bazylak's testimony related to conversations he had with Decedent about the gifts.   The Estate explicitly acknowledged waiving application of the Dead Man's Act.[5]   N.T., 6/3/25, at 34.

On June 6, 2025, the orphans' court entered an order denying and dismissing, with prejudice, the Estate's petition for citation.   The Estate filed a timely notice of appeal and a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.[6]

The Estate raises the following issues for review:

1. Whether the [orphans'] court erred in permitting [Dr.] Bazylak to testify over objections that the testimony was hearsay?

_____

[4] Father Carter is the priest at the church Decedent and Dr. Bazylak attended. He has been the priest since July 2017.  N.T., 6/3/25, at 73.

[5] **See** 42 Pa.C.S.A. § 5930 (providing that "where any party to a thing or contract in action is dead, … and his right thereto or therein has passed … to a party on the record who represents his interest in the subject in controversy, neither any surviving or remaining party to such thing or contract, nor any other person whose interest shall be adverse to the said right of such deceased … shall be a competent witness to any matter occurring before the death of said party").

[6] On September 15, 2025, this Court issued a rule to show cause why the appeal should not be quashed or dismissed.  Rule to Show Cause, 9/15/25. We explained that, absent the record and orphans' court docket entries, we were unable to discern whether the orphans' court's order was final and appealable.  The Estate filed a response, indicating that the orphans' court's order had denied and dismissed its petition with prejudice.   This Court subsequently discharged the rule to show cause.  On review, we agree that the subject order was final and appealable.

2. Whether the [orphans'] court erred in determining Dr. [] Bazylak had met his burden of proof with respect to lifetime gifts?

3. Whether the [orphans'] court erred as a matter of law in applying the [in]correct legal standard to lifetime gifts?

4. Whether the [orphans'] court erred as a matter of law in determining there was no confidential relationship between [Decedent] and Dr. [] Bazylak?

5. Whether the [orphans'] court erred in determining the lifetime gifts were the free and intelligent act of [Decedent]?

Estate's Brief at 4 (some capitalization modified; issues reordered).

Our standard of review of an orphans' court decision is deferential:

When reviewing a[n order] entered by the orphans' court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the orphans' court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion. However, we are not constrained to give the same deference to any resulting legal conclusions.

*In re Fiedler*, 132 A.3d 1010, 1018 (Pa. Super. 2016) (some capitalization modified; citation and paragraph break omitted).

Preliminarily, the Estate does not dispute that the three checks were *inter vivos* gifts from Decedent to Dr. Bazylak.[7]  **See** Estate's Petition for

_____

[7] "A valid *inter vivos* gift requires donative intent, delivery, and acceptance." *In re Estate of Cerullo*, 247 A.3d 52, 55 (Pa. Super. 2021) (citation omitted).  Ordinarily, an alleged donee must prove an *inter vivos* gift by clear, precise, and convincing evidence.  *Id.*  Thereafter, a presumption of validity arises, "and the burden shifts to the contestant to rebut this presumption by clear, precise and convincing evidence."  *Id.*  Relevant to this appeal, "a presumptively valid gift may be rebutted by establishing that donor and donee
*(Footnote Continued Next Page)*

Citation, 8/12/24, ¶ 9 (describing the checks as "lifetime gifts"); Estate's Brief at 9 (in the summary of the argument, stating, "[Decedent] made three *inter vivos* gifts from 2017 to 2019 totaling $2.2 million [] to Dr. Bazylak…."), 10 ("The Estate is not disputing that [Decedent] made *inter vivos* gifts to Dr. Bazylak…."). Thus, we are left with the question of whether the Estate rebutted the presumption of validity by establishing a confidential relationship existed between Decedent and Dr. Bazylak, as well as a corresponding evidentiary issue.

We first consider the Estate's evidentiary challenge. The Estate argues the orphans' court erred by permitting Dr. Bazylak to testify concerning conversations he had with Decedent about the three checks. Estate's Brief at 18. The Estate claims such testimony constituted hearsay, as Decedent was not alive to refute his testimony. *Id.* at 18-19.

Dr. Bazylak counters that much of his testimony (*i.e.*, his description of receiving the checks, the amounts of the checks, his use of the funds) was not hearsay, and was instead based on his personal knowledge and documentary evidence. Appellee's Brief at 26. Dr. Bazylak also argues his testimony concerning conversations with Decedent was admissible under an exception to the rule against hearsay, as it addressed Decedent's state of mind. *Id.* (citing Pa.R.E. 803(3)). According to Dr. Bazylak, any error from admitting

---

had a confidential relationship at the time the alleged gift was made." **Hera v. McCormick**, 625 A.2d 682, 686 (Pa. Super. 1993).

his testimony was harmless, as the orphans' court concluded independent evidence established Decedent's donative intent and capacity.  ***Id.*** at 27.

We adhere to the following standard of review:

> Questions concerning the admission or exclusion of evidence are within the sound discretion of the trial court and may be reversed on appeal only when a clear abuse of discretion was present.  An abuse of discretion requires more than finding an error of judgment or that this Court would have ruled different; instead, discretion is abused if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence of record.  Furthermore, it is well established that in order for a party to be awarded a new trial, the moving party must demonstrate that it was prejudiced by the alleged error of the trial court.

***Hagelauer v. Main Line Emergency Med. Assocs., LLC***, 339 A.3d 483, 487 (Pa. Super. 2025) (citations, paragraph breaks, quotation marks and brackets omitted).

"Hearsay" is "a statement that (1) the declarant does not make while testifying at the current trial or hearing[] and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Pa.R.E. 801(c).  Generally, hearsay is not admissible unless it falls within an established exception.  Pa.R.E. 802.  The admissibility of then-existing state of mind statements is governed by Rule 803(3), which provides as follows:

> **(3) Then-Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

- 10 -

Pa.R.E. 803(3). Under this exception, "where a declarant's out-of-court statements demonstrate her state of mind, are made in a natural manner, and are material and relevant, they are admissible pursuant to the exception." *Hagelauer*, 339 A.3d at 488-89 (citation omitted).

Instantly, the orphans' court did not address the Estate's hearsay argument in its opinion. We also note that, despite reciting the rule against hearsay (albeit without citation to the Pennsylvania Rules of Evidence), the Estate summarily states that Dr. Bazylak's testimony was "classic hearsay." Estate's Brief at 20. The Estate does not discuss whether Dr. Bazylak's statements were offered to prove the truth of the matter asserted, nor does it analyze the possible applicability of an exception to the rule against hearsay. *See In re Estate of Anderson*, 317 A.3d 997, 1006 (Pa. Super. 2024) ("[T]his Court will not act as counsel and will not develop arguments on behalf of an appellant." (citation omitted)); *see also* Pa.R.A.P. 2119(a) (requiring development of an appellate argument with citation and discussion of relevant legal authority).

Instead, the Estate shifts its focus to the fact of Snug Harbor's inception as a for-profit entity.[8] This fact has no bearing on whether the challenged

---

[8] The Estate alleges that "[i]f Dr. Bazylak had initially created non-profit companies … for Snug Harbor, [Decedent] would have received charitable tax deductions. The Estate would not have brought this action because the money would have gone to charity[,] which is the purpose [of] the within action." *(Footnote Continued Next Page)*

testimony constituted hearsay. Further, Dr. Bazylak's argument that the testimony was admissible to establish Decedent's state of mind, and therefore, her donative intent, is persuasive.

We also observe that the Estate raised hearsay objections following Dr. Bazylak's testimony that he discussed with Decedent his desire to purchase a property for the purpose of starting a rehabilitation and recovery facility. ***See*** N.T., 6/3/25, at 42 (Dr. Bazylak testifying that he learned a property became available, and he suggested that Decedent purchase the property), 43 (Dr. Bazylak stating, "[Decedent] said she was going to purchase it and I would run it and then when it came time to purchase it, she said, Robert, I think you should have that and take care of it and you would run it."), 46-47 (Dr. Bazylak testifying that each time Decedent gave him a check, Decedent told him that he would not need to repay her). These statements—regardless of whether they were inadmissible hearsay or satisfy an exception to the rule against hearsay—relate only to Decedent's intentions in giving the checks to Dr. Bazylak. By conceding the checks were *inter vivos* gifts, the Estate has necessarily acknowledged Decedent's donative intent. The challenged statements do not relate to the remaining question of whether a confidential relationship existed, and therefore, we conclude any error in admitting Dr.

---

Estate's Brief at 20; ***see also*** N.T., 6/3/25, at 55, 58 (Dr. Bazylak testifying that Snug Harbor was a for-profit entity when he purchased the property in 2017, and it became a nonprofit within approximately 6 months prior to the hearing).

Bazylak's testimony was harmless. *See Hagelauer*, 339 A.3d at 487 (a moving party must demonstrate it was prejudiced by the alleged error); *see also Knowles v. Levan*, 15 A.3d 504, 508 n.4 (Pa. Super. 2011) ("[H]armless error is defined as an error that does not affect the verdict.").

We address the Estate's remaining claims together, as they are related to the alleged confidential relationship between Decedent and Dr. Bazylak. In its second claim, the Estate argues the orphans' court applied the incorrect legal standard regarding *inter vivos* gifts made while the donee was in a confidential relationship with the donor. *See* Estate's Brief at 10-14.

In its third claim, the Estate contends the orphans' court erroneously concluded that no confidential relationship existed between Decedent and Dr. Bazylak. *Id.* at 14. The Estate argues a confidential relationship was established by virtue of Dr. Bazylak's status both as Decedent's limited power of attorney, and as Decedent's physician, at the time of the transfers. *Id.* at 14-16. Additionally, the Estate points out that Dr. Bazylak was a trustee of the Foundation, and he brought Decedent meals approximately 3 to 4 times per week. *Id.* at 16. According to the Estate, these facts demonstrate Decedent's reliance on Dr. Bazylak during the relevant time period, *i.e.*, between 2017 and 2019. *Id.*

In its fourth and fifth claims, the Estate asserts that Dr. Bazylak did not meet his burden of establishing that the nature of the gifts was fully explained to Decedent. *Id.* at 17. The Estate argues, "Dr. Bazylak showing that

- 13 -

[Decedent] was a generous person does not meet his burden that the gifts made to him were proper." ***Id.*** The Estate also claims Dr. Bazylak cannot rely on Father Carter's testimony, as Father Carter was not present when the gifts were made. ***Id.*** Similarly, the Estate argues there is no evidence to establish that the gifts were given freely and intelligently. ***Id.*** at 18.[9]

As set forth above, the Estate concedes the three checks constitute *inter vivos* gifts. Thus, the gifts are presumed valid, and the burden shifts to the Estate to rebut this presumption. ***See Estate of Cerullo***, 247 A.3d at 55. "[A] presumptively valid gift may be rebutted by establishing that donor and donee had a confidential relationship at the time the alleged gift was made." ***Hera***, 625 A.2d at 686; ***see also Trust Under Deed of Walter R. Garrison***, 302 A.3d 129, 137-38 (Pa. Super. 2023) ("The challenger of an *inter vivos* transfer need only establish a single thing: that the donor and donee were in a confidential relationship."). The hallmark of a confidential relationship involves an "overmastering influence" by one party, and "weakness, dependence or trust" by the other party. ***Hera***, 625 A.2d at 690.

> [A] challenger to an *inter vivos* gift claiming undue influence bears no burden of showing that the donor had a weakened intellect. Rather, an *inter vivos* gift to one in a confidential relationship with the donee will be condemned, even in the absence of evidence of actual fraud, or of mental incapacity on the part of the donor, unless there is full and satisfactory proof that it was the free and

---

[9] The Estate's fourth and fifth claims are minimally developed, and include only a single citation to case law. ***See*** Pa.R.A.P. 2119(a) (providing that an appellate argument shall include "such discussion and citation of authorities as are deemed pertinent.").

intelligent act of the donor, fully explained to h[er], and done with a knowledge of its consequence.

**Trust Under Deed of Walter R. Garrison**, 302 A.3d at 138 (citation and internal quotation marks omitted). Thus, if a challenger establishes the existence of a confidential relationship "at the time the alleged gift was made, the burden shifts to the donee to show that the alleged gift was free of any taint of undue influence or deception." **Hera**, 625 A.2d at 690.

Here, the Estate correctly asserts that "the existence of a power of attorney given by one person to another is a clear indication that a confidential relationship exists between the parties." **Estate of Lakatosh**, 656 A.2d 1378, 1383 (Pa. Super. 1995); **see also Hera**, 625 A.2d at 691 (stating, "a confidential relationship may be established by proof that the alleged donee possessed a power of attorney over a decedent's assets"). It is undisputed that Dr. Bazylak possessed a limited power of attorney during the time period in which he received the three checks.[10]

Additionally, Dr. Bazylak's role as Decedent's physician is an indication that a confidential relationship existed:

> The relation of the physician to his patient is one of trust and confidence, and while such a relation does not *per se* forbid the acceptance of a gift or conveyance by him from his patient, the burden is on the physician to prove that such gift or conveyance

---

[10] The orphans' court distinguishes **Lakatosh** on the basis that Dr. Bazylak never exercised any powers pursuant to the power of attorney, "and the parties' relationship existed entirely without that element." Orphans' Court Opinion, 6/6/25, at 5 n.6.

was fairly and honestly obtained and that the transaction was above suspicion.

***Matthaei v. Pownall***, 84 A. 444, 445 (Pa. 1912) (citation omitted). Nevertheless, we conclude the record supports the orphans' court's finding that Dr. Bazylak established Decedent freely and intelligently gifted Dr. Bazylak the three checks, and Decedent was aware of the consequences of her gifts.

During the hearing, Dr. Bazylak testified that he met Decedent at church in the early 2000s. N.T., 6/3/25, at 8. Decedent eventually became one of Dr. Bazylak's patients. ***Id.*** at 8. In 2004, Decedent appointed Dr. Bazylak as a trustee to the Foundation. ***Id.*** at 14. Additionally, Decedent named Dr. Bazylak her limited power of attorney in 2016. ***See id.*** at 9-10. However, Dr. Bazylak never acted as Decedent's agent under the power of attorney.[11] ***Id.*** at 10; ***see also id.*** at 12 (Dr. Bazylak indicating he stopped serving as power of attorney in approximately 2023). Viscusi confirmed that, in her review of Decedent's accounts as executrix of the Estate, she found no evidence that Dr. Bazylak performed any actions as Decedent's attorney-in-fact. ***Id.*** at 20-21. Dr. Bazylak never received compensation for his role as limited power of attorney. ***Id.*** at 41.

---

[11] Because Dr. Bazylak never acted as Decedent's power of attorney, the orphans' court correctly concluded "there is nothing for Dr. Bazylak to account for during that time period." Orphans' Court Opinion, 6/6/25, at 5.

- 16 -

The record also reveals a long-time friendship between Dr. Bazylak and Decedent. Dr. Bazylak explained that he and his wife went to dinner with Decedent and their priest every weekend. *Id.* at 14. Dr. Bazylak and Decedent alternated paying the bill for these outings. *Id.* Dr. Bazylak alleged these social interactions occurred throughout the time period in which he received the checks. *Id.* at 14-15.[12] Additionally, Dr. Bazylak testified that he dropped off meals at Decedent's house approximately three or four times a week, when pharmaceutical representatives brought food to his office. *Id.* at 15.

As previously stated, Dr. Bazylak first met Decedent through their church in Conneaut Lake, Pennsylvania. According to Dr. Bazylak, the priest at the church asked him to help Decedent make an appointment with another physician. *Id.* at 8. Decedent eventually became one of Dr. Bazylak's patients. Dr. Bazylak described various times he attended to Decedent's injuries and illnesses. *See id.* at 39-40. After one injury, Dr. Bazylak visited Decedent several days in a row to help her change the dressings on her wounds. *Id.* at 40. Additionally, Dr. Bazylak testified that after Decedent fell while walking her dog, "Neighbors didn't call an ambulance, they called me."

_____

[12] We note that counsel for the Estate specifically asked Dr. Bazylak about social interactions he had with Decedent in 2017. N.T., 6/3/25, at 14. Counsel did not ask whether Dr. Bazylak began going to dinner with Decedent prior to that year.

*Id.* Decedent had fractured her hip, and she stayed at Dr. Bazylak's home for about six weeks after surgery. *Id.*[13]

Regarding the gifts, Dr. Bazylak testified that Decedent was aware of his involvement with drug addiction treatment services and hospice. *Id.* at 42. Dr. Bazylak testified as follows:

> During our conversations, [Decedent] would say you should start your own place and continue doing that. And I told her, I didn't feel like I could do that at that time because it was a big undertaking. And our hospice director -- medical director was Sister Norma Jean, who notified me that Gannondale, which was … Bishop Gannon's old retreat, in Harborcreek, was available. And **I talked to [Decedent] about her purchasing that** and we could work up there.

*Id.* (emphasis added). Dr. Bazylak further stated,

> [Decedent] made a visit to the place and fell in love with it and wanted to purchase it because the [S]isters of [C]harity were running that place for wayward girls and it had become nonfunctional at that time[,] and she thought it would be a good place. [Decedent] said she was going to purchase it and I would run it[,] and then when it came time to purchase it, she said, Robert, I think you should have that and take care of it and you would run it.

*Id.* at 43. According to Dr. Bazylak, Decedent emphasized that he would be helping people by starting a rehabilitation and recovery facility. *See id.* Based on these conversations, Dr. Bazylak used the first check ($1,000,000 issued on August 10, 2017) to purchase the property for the rehabilitation facility. *Id.* at 42-43; *see also* Exhibit 3 (Purchase and Sale Agreement).

---

[13] Dr. Bazylak could not recall the sequence of the events he described.

Decedent gave Dr. Bazylak a second check, in the amount of $200,000, on July 20, 2018. Dr. Bazylak used the funds from the second check for payroll and to purchase equipment for Snug Harbor. N.T., 6/3/25, at 46. Dr. Bazylak explained the expenses he incurred between 2017 and 2018:

> It took us over a year to get a state license to operate a rehabilitation and recovery [facility]. Also we wanted to set up an in-patient hospice, because of the building there that was quite adaptable for hospice patients, but the township said we had to put [a] sprinkler system in before we could get a license. The sprinkler system cost $500,000. So we decided to just hold off on that for the time being and try to get the rehabilitation recovery license.

*Id.*

Decedent gave Dr. Bazylak the third check ($1,000,000 issued on November 8, 2019), which Dr. Bazylak used for Snug Harbor's upkeep and payroll expenses. *Id.* at 46.

Dr. Bazylak testified that each time Decedent gave him a check, he told her that he would begin repaying Decedent as soon as Snug Harbor started to make money. *Id.* According to Dr. Bazylak, Decedent repeatedly stated the money was a gift. *Id.* at 46-47. Dr. Bazylak also stated that he has contributed more than $2,000,000 to Snug Harbor himself, and that he has never taken a salary from its operation. *Id.* at 47-48.

Viscusi also testified that the three checks were gifts to Dr. Bazylak. *Id.* at 22.[14, 15]

Additionally, Dr. Bazylak offered as a witness Father Carter, the priest at the church Dr. Bazylak and Decedent attended in Conneaut Lake. *Id.* at 63. Father Carter stated he knew Decedent very well. *Id.* Decedent asked Father Carter to participate in a committee to help the Foundation select students to receive full scholarships through the Foundation. *Id.* at 64.

Father Carter testified that he participated in an estate planning meeting with Decedent, Decedent's broker, and another attorney. *Id.* at 64-65.[16] According to Father Carter, Decedent's broker questioned Decedent about the three checks, and Decedent stated that the checks were gifts for which she did not expect repayment. *Id.* at 67-68.

_____

[14] Decedent paid off Viscusi's home mortgage. Viscusi testified that she ultimately repaid Decedent, without interest. N.T., 6/3/25, at 26-27.

[15] Viscusi explained she filed the petition under the belief that Decedent had expected Dr. Bazylak to repay her. N.T., 6/3/25, at 28. According to Viscusi, this assumption was based on "roundabout comments" Decedent made in approximately 2021, *id.* at 28-29, when, as the orphans' court found, Decedent had started becoming confused. *See* Orphans' Court Opinion, 6/6/25, at 2 n.7. There is no testimony suggesting that Decedent expressed an intention to be repaid at any prior time.

[16] Father Carter was part of the estate planning meeting because Decedent intended to name him as the executor of the Estate, along with Dr. Bazylak. N.T., 6/3/25, at 65; *see also* Exhibit 4 (prior version of Decedent's Last Will and Testament, which named Father Carter as the executor, and Dr. Bazylak as the executor in the event Father Carter could not perform the duties). Father Carter did not testify as to when the meeting took place. However, the exhibit shows that Decedent executed that version of her will in October 2020.

Instantly, the orphans' court found that "[t]he testimony of Father Carter was credible[,] and [the court] give[s] it significant weight. He was a disinterested witness." Orphans' Court Opinion, 6/6/25, at 7. While the Estate takes issue with the orphans' court's reliance on Father Carter's testimony, we will not disrupt the court's credibility finding. *In re Fiedler*, 132 A.3d at 1018. Additionally, we discern no error in the orphans' court's reliance on Father Carter's testimony. Though Father Carter was not present when Decedent gave Dr. Bazylak the checks, he was involved in an estate planning meeting in 2020, which occurred **before** Decedent began displaying confusion.

We acknowledge Dr. Bazylak's legal status as Decedent's power of attorney and physician suggests the existence of a confidential relationship. However, *under these particular circumstances*, there is no evidence that Dr. Bazylak held or exerted an overmastering influence over Decedent. *See Trust under Deed of Walter R. Garrison*, 302 A.3d at 138 ("The existence of a confidential relationship is dependent upon the facts of each particular case."). The testimony depicts more than simply a doctor-patient or agency-principal relationship; instead, the evidence demonstrates that Dr. Bazylak and Decedent shared a friendship for many years before and during the time Decedent gave Dr. Bazylak the checks.

The testimony of Dr. Bazylak and Father Carter amply supports the orphans' court's finding that the gifts were a product of Decedent's free and intelligent acts. The only contradictory testimony was provided by Viscusi,

who testified regarding "roundabout comments" Decedent made to her in 2021 or later, when Decedent had become confused and generally distrusting. The orphans' court concluded Viscusi's testimony was "not surprising or particularly pertinent" in light of the fact that beginning in approximately 2021, "Decedent became distrusting of the people in her life and began to act erratically and make nonsensical accusations toward others." Orphans' Court Opinion, 6/6/25, at 3.

Further, as the orphans' court emphasizes,

> [Decedent] understood Dr. Bazylak's interest in starting a recovery facility[;] she supported it[;] and it was her choice to give him the money to fund it. It is worth noting that it is not as if Decedent wrote one check on one occasion; she gave Dr. Bazylak three separate checks, each a year apart. After the purchase of the real property in 2017, she had time to change her mind, but Decedent continued [to] write two more checks for Dr. Bazylak to use toward the rehabilitation facility.

*Id.* at 5.

Based upon the foregoing, we conclude the three checks were valid *inter vivos* gifts from Decedent to Dr. Bazylak. We therefore affirm the orphans' court order denying and dismissing the Estate's petition for citation.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

4/9/2026