J-A06019-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF PATRICIA HENNINGER | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: COMMONWEALTH OF PENNSYLVANIA | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 817 WDA 2025 |

Appeal from the Order Entered June 6, 2025
In the Court of Common Pleas of Crawford County Orphans' Court at
No(s): OC 2024-0090

BEFORE: OLSON, J., MURRAY, J., and BECK, J.

MEMORANDUM BY MURRAY, J.:         **FILED: April 9, 2026**

The Commonwealth of Pennsylvania appeals from the orphans' court's order denying and dismissing, with prejudice, its petition for citation to show cause why respondent, Robert Bazylak, M.D. (Dr. Bazylak), should not be compelled to account.[1] After careful review, we affirm.

Patricia Henninger, deceased (Decedent), "was a generous person with a substantial estate who would frequently make gifts. [] Decedent gave away

---

[1] The Estate of Patricia Henninger (the Estate) initiated the underlying proceedings by filing a petition for citation directed to Dr. Bazylak on August 12, 2024. The Pennsylvania Attorney General, acting on behalf of the Commonwealth, joined the action and has participated in these proceedings as *parens patriae*, because the Estate's assets include a charitable trust. **See** 20 Pa.C.S.A. § 7735(c) (permitting the Attorney General to bring a proceeding to enforce a charitable trust); **see also In re Estate of Bavol**, 300 A.3d 1051, 1053 n.2 (Pa. Super. 2023) (explaining that when a decedent's will designates charitable beneficiaries, "the Commonwealth has standing to safeguard their interests.").

large sums of money to churches, schools, scholarships, animal shelters, and individuals." Orphans' Court Opinion, 6/6/25, at 1.

As Decedent's relationship with Dr. Bazylak is central to this appeal, we recount that relationship. "Dr. [] Bazylak met [] Decedent through their church in the early 2000's. He eventually became her physician." *Id.*

In 2004, Decedent established the Carl E. Henninger Foundation (the Foundation) in honor of her late husband. *See* N.T., 6/3/25, at 14. Decedent appointed Dr. Bazylak as a trustee of the Foundation. *See id.*

On November 10, 2016, Decedent executed a limited power of attorney, appointing Dr. Bazylak as her attorney-in-fact. Dr. Bazylak subsequently accepted the appointment. However, Dr. Bazylak "never acted as [Decedent's] agent at any time." Orphans' Court Opinion, 6/6/25, at 2.[2]

"In 2017, when [] Decedent was approximately 87 years old[,] Decedent often went to dinner with Dr. Bazylak and his wife. Dr. Bazylak would take [] Decedent meals and checked in on her...." *Id.* at 2.

The orphans' court summarized the three payments Decedent made to Dr. Bazylak, which are at issue in this appeal:

> In 2017, Decedent became aware that Dr. Bazylak wanted to establish a rehabilitation and recovery facility[,] and Decedent wanted to fund that endeavor. On August 10, 2017, [] Decedent wrote a check to [Dr.] Bazylak in the amount of $1,000,000. Dr. Bazylak used the money to purchase property to establish the

---

[2] According to the averments in the Estate's petition for citation, Dr. Bazylak ceased being Decedent's limited power of attorney in 2021. Estate's Petition for Citation, 8/12/25, ¶ 8.

rehabilitation facility[, Snug Harbor Rehabilitation and Recovery (Snug Harbor)]. On July 20, 2018, [] Decedent wrote a check to [Dr.] Bazylak in the amount of $200,000. Dr. Bazylak used the money for costs and expenses of the rehabilitation facility. On October 8, 2019, [] Decedent wrote a check to [Dr.] Bazylak in the amount of $1,000,000. This money was also used to pay costs and expenses of the rehabilitation facility. Decedent never intended to be repaid. Rather, it was Decedent's intention to make gifts to Dr. Bazylak to establish the rehabilitation facility. And Decedent did[,] in fact[,] deliver the three separate checks as gifts to Dr. Bazylak on three separate occasions.[FN]

---

[FN] Although the amounts of these checks may seem high, they are a considerably small percentage of [] Decedent's very substantial estate.

*Id.*

Additionally, the orphans' court made factual findings related to Decedent's mental state during the last several years of her life. The orphans' court found that "Decedent was not confused, weak, or incapacitated in 2017, 2018, or 2019." *Id.*, n.2; *see also id.* at 2 (indicating that Decedent did not exhibit weakness or confusion in 2017). Instead, the orphans' court found that Decedent became confused in approximately "2021[, when she was approximately 91 years old,] or possibly around the COVID period when she became isolated." *Id.*, n.2; *see also id.* at 3 (indicating that during that time, "Decedent became distrusting of the people in her life and began to act erratically and make nonsensical accusations toward others."). Further, just

days before Decedent's death, Colleen Viscusi (Viscusi) was appointed as Decedent's guardian. *Id.* at 2 n.2.[3]

Decedent died testate on February 19, 2024. In her will, Decedent named Viscusi as the executrix of her estate. *See* Exhibit A (Last Will and Testament of Patricia L. Henninger, 8/30/22), § 3.01. Pertinently, Decedent's will provided for distribution of the Estate as follows:

> My Executor will distribute my entire probate estate to the Trustee of the Patricia L. Henninger Living Trust dated June 9, 2004, to hold and administer according to the provisions of that trust.

*Id.*, § 3.04.

Under the terms of the trust, Decedent was the sole named trustee. *See* Exhibit B (Patricia L. Henninger Living Trust, 8/30/22), Art. 1. The trust also named Viscusi as the first trustee in succession following Decedent's death. *Id.*, § 3.03. Generally, the trust dictated that upon Decedent's death, the trust would become irrevocable, and the acting trustee would be "authorized, but not directed" to pay, *inter alia*, expenses related to Decedent's funeral and the expenses of administering the trust and Estate. *See id.*, Art. 5. Significantly, Article Six of the trust provides as follows:

> Upon Settlor's death, the Trustee will distribute the residuary trust estate to [the] Carl and Patricia Henninger Fund, a component fund of the Pittsburgh Foundation of Pittsburgh, Pennsylvania[,] outright, free of trust.

_____

[3] Viscusi was also Decedent's financial power of attorney. *See* Exhibit 1 (Financial Power of Attorney, 10/28/21).

- 4 -

*Id.*, Art. 6.

On August 12, 2024, the Estate filed a petition for citation directed to Dr. Bazylak, seeking an accounting for the time during which he was Decedent's attorney-in-fact. The orphans' court issued the citation and directed Dr. Bazylak to respond. Dr. Bazylak filed an answer and new matter.

Subsequently, on December 2, 2024, the Commonwealth filed a petition for citation to show cause why Dr. Bazylak should not be compelled to file an account. The Commonwealth alleged its intervention was warranted, because if the Estate's petition proceedings are successful, then more funds would benefit charity. Commonwealth's Petition for Citation, 12/2/24, ¶¶ 15-16. The Commonwealth argued the checks were not valid *inter vivos* gifts because they "were made during the time [Dr.] Bazylak was agent in fact, physician and fellow board member to [D]ecedent." *Id.*, ¶ 24. The orphans' court issued the citation and directed Dr. Bazylak to show cause why he should not be compelled to account for his period of agency.

Dr. Bazylak filed an answer and new matter in which he acknowledged that he was Decedent's physician, and that he received gifts from Decedent totaling $2.2 million. Answer and New Matter, 1/27/25, Answer ¶ 6, New Matter ¶ 10. Dr. Bazylak asserted he did not exert undue influence over Decedent. *Id.*, New Matter ¶ 12. Further, Dr. Bazylak emphasized Decedent's history of charitable giving and her intention to help Dr. Bazylak fund Snug Harbor. *Id.*, New Matter ¶¶ 11, 13.

The Commonwealth filed an answer to Dr. Bazylak's new matter, averring that Dr. Bazylak failed to set forth *prima facie* evidence that the gifts were valid. On February 14, 2024, Dr. Bazylak filed a motion for partial summary judgment. Dr. Bazylak denied exercising any rights or powers during his time as Decedent's attorney-in fact, and argued that neither the Estate nor the Commonwealth alleged that he had made the gifts to himself as Decedent's agent. **See** Motion for Partial Summary Judgment, 2/14/24, ¶ 4. Dr. Bazylak emphasized that claims for undue influence are subject to a two-year statute of limitations. **Id.**, ¶¶ 7-14 (citing 42 Pa.C.S.A. § 5524(7) (providing a two-year statute of limitations applies to "[a]ny other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action of proceeding sounding in trespass, including deceit or fraud, except an action or proceeding subject to another limitation specified in this subchapter.")). Dr. Bazylak therefore sought dismissal of the undue influence claims, but did not seek dismissal of the claims seeking an accounting.

The Commonwealth filed an answer and an accompanying brief. The Commonwealth again argued that Dr. Bazylak failed to establish the checks constituted valid *inter vivos* gifts.[4] Additionally, the Commonwealth asserted that the statute of limitations does not apply to courts of equity.

---

[4] The Commonwealth specifically asserted the following:
*(Footnote Continued Next Page)*

On March 17, 2025, the orphans' court denied Dr. Bazylak's motion for partial summary judgment and scheduled a hearing on the petitions for citation. Dr. Bazylak,[5] Viscusi, and Father David Carter (Father Carter)[6] testified during the hearing. Pertinently, portions of Dr. Bazylak's testimony related to conversations he had with Decedent about the gifts. The Estate explicitly acknowledged waiving application of the Dead Man's Act (which we discuss *infra*). N.T., 6/3/25, at 34. However, the Commonwealth lodged a continuing objection to any testimony offered by Dr. Bazylak pertaining to conversations he had with Decedent about the checks. *Id.* at 38-39. The Commonwealth denied waiving its challenge under the Dead Man's Act

_____

> Dr. Bazylak's motion [for partial summary judgment] misidentifies the cause of action filed by the Commonwealth as a claim of undue influence. The Commonwealth pleads instead that there was no valid *inter vivos* gift as defined by the law in the Commonwealth of Pennsylvania. This is a separate and distinct cause of action from a claim of undue influence and does not require proof of undue influence to prevail, though that is one way to do so.

Answer and Brief in Support of Opposition to Motion for Summary Judgment, 3/6/25, Brief at 1 (unnumbered) (some capitalization modified).

[5] The Estate, believing it carried the initial burden (despite the orphans' court's disagreement), first called Dr. Bazylak for cross-examination. *See* N.T., 6/3/25, at 5-6 (counsel for the Estate arguing the Estate had the initial burden of establishing a confidential relationship, and Dr. Bazylak and the orphans' court disagreeing). After the Estate offered the testimony of Viscusi, Dr. Bazylak again took the stand for direct examination.

[6] Father Carter is the priest at the church Decedent and Dr. Bazylak attended. He has been the church's priest since July 2017. N.T., 6/3/25, at 73.

because it did not participate in Dr. Bazylak's deposition, nor did it cross-examine him during the hearing. **Id.** at 36. The orphans' court permitted Dr. Bazylak to testify.[7]

On June 6, 2025, the orphans' court entered an order denying and dismissing, with prejudice, the Commonwealth's petition for citation. The Commonwealth filed a timely notice of appeal and a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.[8]

The Commonwealth raises the following issues for review:

1. Given that the Commonwealth of Pennsylvania did not waive the protections available under the Dead Man's Act[,] 42 Pa.C.S.A. § 5930, did the orphans' court err in permitting Dr. [] Bazylak to testify about his interactions with the [D]ecedent … and the

_____

[7] We note that the orphans' court did not render a decision concerning Dr. Bazylak's competence to testify at the time of the hearing. Instead, the orphans' court acknowledged it had never been presented with a situation in which one party waived a Dead Man's Act challenge, and another party wished to preserve it. **See** N.T., 6/3/25, at 34. The court allowed Dr. Bazylak to testify, and indicated it would research the issue to determine whether it would have to limit its consideration of Dr. Bazylak's testimony to the Commonwealth's case. **See id.** at 37 ("So I think Dr. Bazylak can testify regarding the checks, regarding his interactions with [Decedent] regarding those checks, and I can use that evidence regarding the petition filed by [the Estate]. I may not be able to use that testimony regarding the petition filed by the Commonwealth. I'll have to take a look at that.") (some capitalization modified).

[8] On September 15, 2025, this Court issued a rule to show cause why the appeal should not be quashed or dismissed. Rule to Show Cause, 9/15/25. We explained that, absent the record and orphans' court docket entries, we were unable to discern whether the orphans' court's order was final and appealable. The Commonwealth filed a response, indicating that the orphans' court's order had denied and dismissed its petition with prejudice. This Court subsequently discharged the rule to show cause. On review, we agree that the subject order was final and appealable.

circumstances in which she had given him three checks totaling $2.2 million?

2. Given that Dr. Bazylak was [Decedent's] physician and agent when she gave him three checks totaling $2.2 million, did the orphans' court err in determining that no confidential relationship existed between those two individuals when the money was transferred?

3. Given that Father [] Carter was not present when [Decedent] transferred the money to Dr. Bazylak[,] and did not know the amounts transferred or the circumstances surrounding the transfers, did the orphans' court err in relying on Father Carter's testimony to determine that Dr. Bazylak had satisfied his burden of showing that the transfers had been free of any taint of undue influence or deception?

Commonwealth's Brief at 4-5 (some brackets omitted; some capitalization modified).

Our standard of review of an orphans' court decision is deferential:

When reviewing a[n order] entered by the orphans' court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the orphans' court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion. However, we are not constrained to give the same deference to any resulting legal conclusions.

*In re Fiedler*, 132 A.3d 1010, 1018 (Pa. Super. 2016) (some capitalization modified; citation and paragraph break omitted).

We address the Commonwealth's issues simultaneously. In its first claim, the Commonwealth asserts the orphans' court erred by rejecting its Dead Man's Act challenge and permitting Dr. Bazylak to testify. **See** Commonwealth's Brief at 15-19. The Commonwealth argues, "Despite the

Commonwealth's explicit invocation of the Dead Man's Act, the orphans' court relied on the Estate's waiver to admit and consider Dr. Bazylak's testimony." *Id.* at 17-18. The Commonwealth asserts the Estate's waiver of the Dead Man's Act cannot be imputed to the Commonwealth. *Id.* at 18. Additionally, though Dr. Bazylak could overcome the Dead Man's Act protections by presenting independent testimony establishing the validity of the gifts, the Commonwealth argues Dr. Bazylak "did not surmount that hurdle." *Id.* at 16; *see also id.* at 19.

In its second claim, the Commonwealth contends that, even if Dr. Bazylak could meet his initial burden of proving the checks were *inter vivos* gifts, it successfully rebutted the presumption of validity by establishing the existence of a confidential relationship between Dr. Bazylak and Decedent. *Id.* at 20. The Commonwealth highlights Dr. Bazylak's role as Decedent's physician and attorney-in-fact when he received the checks. *Id.* at 20-23. According to the Commonwealth, a confidential relationship existed as a matter of law, and "the burden should have shifted to Dr. Bazylak to affirmatively demonstrate that the relevant transfers of money were fair and equitable." *Id.* at 24-25.

In its third claim, the Commonwealth asserts that Dr. Bazylak did not establish that Decedent gave him the checks free of the taint of undue influence. *Id.* at 25. The Commonwealth claims the orphans' court improperly relied on Father Carter's testimony about statements Decedent

made in his presence, as Father Carter was not present when the gifts were made. *Id.* at 25-26. The Commonwealth therefore argues Father Carter's testimony has no bearing on the question of whether Decedent understood the consequences of the gifts at the time she gave Dr. Bazylak the checks. *Id.* at 26. Additionally, the Commonwealth emphasizes that Snug Harbor was created as a for-profit entity and was not converted to a nonprofit until after the Estate filed its petition for citation. *Id.* at 28; *see also id.* at 28-29 (arguing that because Snug Harbor was not a charitable organization, Father Carter's testimony concerning Decedent's history of charitable giving was irrelevant).

"Gifts made *inter vivos* are normally valid. The right to dispose of property is an incident of ownership, and a gift is none the less valid because it is undeserved or improvident." *McCown v. Fraser*, 192 A. 674, 676 (Pa. 1937). "A valid *inter vivos* gift requires donative intent, delivery, and acceptance." *In re Estate of Cerullo*, 247 A.3d 52, 55 (Pa. Super. 2021) (citation omitted).

> Initially, the burden is on the alleged donee to prove an *inter vivos* gift by clear, precise and convincing evidence. Once *prima facie* evidence of a gift is established a presumption of validity arises and the burden shifts to the contestant to rebut this presumption by clear, precise and convincing evidence.

*Id.* (citations omitted).

The Dead Man's Act provides, in relevant part, as follows:

Except as otherwise provided in this subchapter, in any civil action or proceeding, where any party to a thing or contract in action is

- 11 -

dead … and his right thereto or therein has passed, either by his own act or by the act of the law, to a party on the record who represents his interest in the subject in controversy, neither any surviving or remaining party to such thing or contract, nor any other person whose interest shall be adverse to the said right of such deceased … party, shall be a competent witness to any matter occurring before the death of said party….

42 Pa.C.S.A. § 5930.

Thus, under the Dead Man's Act, the following three conditions must be met in order to disqualify a witness:

(1) the deceased must have had an actual right or interest in the matter at issue, *i.e.*[,] an interest in the immediate result of the suit; (2) the interest of the witness—not simply the testimony— must be adverse; [and] (3) a right of the deceased must have passed to a party of record who represents the deceased's interest.

*In re Fiedler*, 132 A.3d at 1024 (citation omitted).

As this Court has explained, the purpose of the Dead Man's Act

is to prevent the injustice that would result from permitting a surviving party to a transaction to testify favorably to himself and adversely to the interest of the decedent when the representative of the decedent would be hampered in attempting to refute the testimony by reason of the death of the decedent. The theory is that because the decedent's representative is unable to present evidence regarding the transaction, the other party to the transaction should be similarly restricted.

*Estate of Cerullo*, 247 A.3d at 55 (citation omitted); *see also In re Fiedler*, 132 A.3d at 1024 ("The rationale behind the Dead Man's Act is that the law should not permit the surviving party to testify since he could lie and attempt to testify favorably to himself and adversely to the deceased party, knowing the other party is incapable of contradicting the fallacious testimony.").

"Application of the Dead Man's Act becomes 'difficult,' however, 'where there are allegations of an *inter vivos* gift by the decedent to the challenged donee.'" **Estate of Cerullo**, 247 A.3d at 56 (citing **Friedeman v. Kinnen**, 305 A.2d 3, 4 (Pa. 1973)).

> In such circumstances, if a valid *inter vivos* transfer can be shown by independent evidence before the admission of any testimony by the alleged donee, the donee will be considered to represent the interest of the decedent and will be permitted to testify. Conversely, if the alleged donee fails to establish a *prima facie* gift by independent testimony before he takes the stand, he will not be competent to testify. … **Where there is an issue regarding the validity of an *inter vivos* gift, the court may not admit statements of [the] decedent absent independent testimony establishing *prima facie* evidence of donative intent and delivery.** If the alleged donee fails to establish *prima facie* evidence of a gift or transfer by independent testimony before he takes the stand, he is not competent to testify.

*Id.* (some emphasis added; citations, paragraph breaks, and some ellipses omitted).

Thus, to satisfy the Dead Man's Act, an interested party must present independent testimony establishing *prima facie* evidence of both donative intent and delivery before testifying himself. **See id.** Regarding Decedent's donative intent, Dr. Bazylak offered testimony from Father Carter, the priest at the church Dr. Bazylak and Decedent attended in Conneaut Lake. N.T., 6/3/25, at 63. Father Carter stated he knew Decedent very well. **Id.** After Father Carter arrived at the church, Decedent asked him to participate in a committee to help the Foundation select students to receive full scholarships through the Foundation. **Id.** at 64.

Father Carter testified that he participated in an estate planning meeting with Decedent, Decedent's broker, and another attorney. *Id.* at 64-65.[9] According to Father Carter, Decedent's broker questioned Decedent about the three checks, and Decedent stated that the checks were gifts for which she did not expect repayment. *Id.* at 67-68.[10]

Instantly, the orphans' court concluded Father Carter's testimony provided sufficient independent evidence of Decedent's donative intent. The orphans' court found that "[t]he testimony of Father Carter was credible[,] and [the court] give[s] it significant weight. He was a disinterested witness."

_____

[9] Father Carter was part of the estate planning meeting because Decedent intended to name him as the executor of the Estate, along with Dr. Bazylak. N.T., 6/3/25, at 65; *see also* Exhibit 4 (a prior version of Decedent's Last Will and Testament, which named Father Carter as the executor, and Dr. Bazylak as the executor in the event Father Carter could not perform the duties). Father Carter did not testify as to when the meeting took place. However, the exhibit shows that Decedent executed that version of her will in October 2020.

[10] The Commonwealth objects to any reliance on Father Carter's testimony as independent evidence, because Father Carter testified <u>after</u> Dr. Bazylak. We acknowledge language in prior case law suggesting independent testimony must be offered <u>before</u> the testimony of the interested party. *See Estate of Cerullo*, 247 A.3d at 56 (stating the orphans' court may not admit statements of a decedent unless the alleged donee establishes *prima facie* evidence of a gift by independent testimony "before he takes the stand" (citing *Hera*, 625 A.2d at 688)). However, other cases mention no requirement that the independent testimony is inadmissible if not offered first. *See In re Estate of Petro*, 694 A.2d 627, 632-33 (Pa. Super. 1997) (stating "the court could not admit the daughters' testimony regarding [the decedent's] statements about *inter vivos* gifts without independent testimony establishing *prima facie* evidence of donative intent and delivery"). Regardless, we conclude that any error in introducing Father Carter's testimony after Dr. Bazylak's testimony was harmless.

- 14 -

Orphans' Court's Opinion, 6/6/25, at 7.  While the Commonwealth takes issue

with the orphans' court's reliance on Father Carter's testimony, we will not

disrupt the court's credibility finding.  **In re Fiedler**, 132 A.3d at 1018.

Further, the orphans' court stated the following:

> **The** [**Commonwealth**] **… did not call witnesses or attempt
> to meet any burden at all**, instead choosing to rely on the
> testimony adduced by the Estate to support its contention that Dr.
> Bazylak had a confidential relationship with [] Decedent.  It is
> clear to the court that it was the petitioners' strategy for one of
> them to waive the Dead Man's Act and the other to choose not to
> waive it.  From petitioners' perspective, they could have it both
> ways: the Estate could prove the confidential relationship by
> calling Dr. Bazylak[] as on cross[-]examination, and at the same
> time, the [Commonwealth] could preserve the Dead Man's Act
> objection for appellate purposes by not asking Dr. Bazylak any
> questions.  Given that this is a court of equity, **we cannot
> condone this type of use of the Dead Man's Act**.  It would be
> fundamentally unfair to allow the [Commonwealth] to rely on the
> evidence adduced by the Estate but then to turn around and seal
> his opponent's lips by the Dead Man's Rule.

Orphans' Court Opinion, 6/6/25, at 6 (emphasis added; citation and paragraph

break omitted; some capitalization modified); **see generally In re Estate of

Aiello**, 993 A.2d 283, 288 (Pa. Super. 2010) ("A party seeking equitable relief

must come before the court with clean hands.").

Concerning the delivery requirement, this Court has explained that "[a]n

actual or constructive delivery must not only divest [the] donor of all dominion

and control over the property, but also must invest [the] donee with complete

control over the subject matter of the gift." **Hera**, 625 A.2d at 440.  Delivery

must be completed within the donor's lifetime.  **Campbell's Estate**, 118 A.

547, 548 (Pa. 1922).  Evidence of delivery "depends on the nature of the

- 15 -

property and attending circumstances." *In re Reist's Estate*, 44 A.2d 847, 848 (Pa. Super. 1945).

Here, the record confirms that Decedent delivered checks to Dr. Bazylak on three separate occasions. Each check was signed by Decedent, identified Dr. Bazylak as the payee, and designated a specified amount. *See* Exhibit C (copies of the three checks).[11] The checks show that each was endorsed and deposited by Dr. Bazylak. *See id.* Importantly, Dr. Bazylak deposited the checks in 2017, 2018, and 2019, several years prior to Decedent's death. *See Campbell's Estate*, 118 A. at 548-49 ("[T]he endorsement of a check absolute in form is sufficient to give rise to a presumption of a gift of a check. A stronger presumption arises from the drawing of a check to the order of one who sets up a gift of it."). *Cf. In re Eshenbaugh's Estate*, 174 A. 809, 811 (Pa. Super. 1934) (concluding that the appellant did not prove constructive delivery of four bank accounts, where the decedent gave the appellant two blank checks; "Until filled in for a definite amount, payable to a named person, presentation to the banks of the checks which were handed the appellant would have availed the appellant nothing, and the banks could legally have paid nothing on account of them. And unless so filled in and drawn for the exact amount standing to the credit of the drawer, the death of the drawer

---

[11] We acknowledge that Exhibit C was offered into evidence during Dr. Bazylak's initial cross-examination. *See* N.T., 6/3/25, at 11-13. However, Viscusi was also presented with Exhibit C during her testimony, and she agreed that Decedent wrote the checks. *Id.* at 21.

would have revoked the gift before actual payment."). Under these circumstances, Decedent, within her lifetime, fully divested her control over the property and invested Dr. Bazylak with complete control. **See Hera**, 625 A.2d at 440. The independent evidence therefore established delivery of the checks.

Because the record confirms both Decedent's donative intent and the delivery of the checks to Dr. Bazylak, the orphans' court did not err in determining the checks constituted *inter vivos* gifts. The gifts are therefore presumptively valid, and the burden shifted to the Commonwealth to rebut the presumption. **Estate of Cerullo**, 247 A.3d at 55 ("Once *prima facie* evidence of a gift is established, a presumption of validity arises and the burden shifts to the contestant to rebut this presumption by clear, precise and convincing evidence.").

"[A] presumptively valid gift may be rebutted by establishing that donor and donee had a confidential relationship at the time the alleged gift was made." **Hera**, 625 A.2d at 686; **see also Trust Under Deed of Walter R. Garrison**, 302 A.3d 129, 137-38 (Pa. Super. 2023) ("The challenger of an *inter vivos* transfer need only establish a single thing: that the donor and donee were in a confidential relationship."). The hallmark of a confidential relationship involves an "overmastering influence" by one party, and "weakness, dependence or trust" by the other party. **Hera**, 625 A.2d at 690.

> [A] challenger to an *inter vivos* gift claiming undue influence bears no burden of showing that the donor had a weakened intellect.

- 17 -

> Rather, an *inter vivos* gift to one in a confidential relationship with the donee will be condemned, even in the absence of evidence of actual fraud, or of mental incapacity on the part of the donor, unless there is full and satisfactory proof that it was the free and intelligent act of the donor, fully explained to h[er], and done with a knowledge of its consequence.

*Trust Under Deed of Walter R. Garrison*, 302 A.3d at 138 (citation and internal quotation marks omitted).   Thus, if a challenger establishes the existence of a confidential relationship "at the time the alleged gift was made, the burden shifts to the donee to show that the alleged gift was free of any taint of undue influence or deception." *Hera*, 625 A.2d at 690.

Dr. Bazylak does not dispute that he was both Decedent's attorney-in-fact and physician when he received the three checks.  "[T]he existence of a power of attorney given by one person to another is a clear indication that a confidential relationship exists between the parties." *Estate of Lakatosh*, 656 A.2d 1378, 1383 (Pa. Super. 1995); *see also Hera*, 625 A.2d at 691 (stating, "a confidential relationship may be established by proof that the alleged donee possessed a power of attorney over a decedent's assets").[12] Dr. Bazylak's role as Decedent's physician is an additional indication that a confidential relationship existed:

> The relation of the physician to his patient is one of trust and confidence, and while such a relation does not *per se* forbid the acceptance of a gift or conveyance by him from his patient, the

---

[12] The orphans' court distinguishes *Lakatosh* on the basis that Dr. Bazylak never exercised any powers pursuant to the power of attorney, "and the parties' relationship existed entirely without that element."  Orphans' Court Opinion, 6/6/25, at 5 n.6.

- 18 -

burden is on the physician to prove that such gift or conveyance was fairly and honestly obtained and that the transaction was above suspicion.

*Matthaei v. Pownall*, 84 A. 444, 445 (Pa. 1912) (citation omitted).

However, as the orphans' court pointed out in connection with its Dead Man's Act analysis, the Commonwealth did not offer **any** evidence during the hearing. Orphans' Court Opinion, 6/6/25, at 6. Because the Commonwealth wished to preserve its Dead Man's Act objection, it declined to cross-examine Dr. Bazylak. Nor did the Commonwealth cross-examine Viscusi during her testimony. The Commonwealth's sole involvement, beyond brief arguments at the opening and closing of the hearing, was to ask Father Carter three questions on cross-examination.

The only "clear, precise and convincing evidence" of Dr. Bazylak's status offered at the hearing was through his own testimony and Exhibit F, which was admitted during Dr. Bazylak's testimony. The Commonwealth, as a contestant of the gifts, therefore failed to offer clear, precise and convincing evidence of a confidential relationship. Again, the Commonwealth wishes to benefit from the Estate's introduction of evidence while maintaining its own objection that such evidence should never have been introduced. *See* Orphans' Court Opinion, 6/6/25, at 6 ("From [p]etitioners' perspective, they could have it both ways: the Estate could prove the confidential relationship by calling Dr. Bazylak[] as on cross[-]examination, and at the same time, the [Commonwealth] could preserve the Dead Man's Act objection for appellate

purposes…."). The orphans' court specifically rejected this attempted gamesmanship, and we discern no abuse of its discretion in this regard. *See Estate of Aiello*, *supra*.

Nevertheless, assuming the existence of a confidential relationship, we conclude the record supports the orphans' court's finding that Dr. Bazylak established Decedent freely and intelligently gifted Dr. Bazylak the three checks, and Decedent was aware of the consequences of her gifts.

During the hearing, Dr. Bazylak testified that he met Decedent at church in the early 2000s. N.T., 6/3/25, at 8. Decedent eventually became one of Dr. Bazylak's patients. *Id.* at 8. In 2004, Decedent appointed Dr. Bazylak as a trustee to the Foundation. *Id.* at 14. Additionally, Decedent named Dr. Bazylak her limited power of attorney in 2016. *See id.* at 9-10. However, **Dr. Bazylak never acted as Decedent's agent under the power of attorney**.[13] *Id.* at 10; *see also id.* at 12 (Dr. Bazylak indicating he stopped serving as power of attorney in approximately 2023). Viscusi confirmed that, in her review of Decedent's accounts as executrix of the Estate, she found no evidence that Dr. Bazylak performed any actions as Decedent's attorney-in-fact. *Id.* at 20-21. Dr. Bazylak never received compensation for his role as limited power of attorney. *Id.* at 41.

---

[13] Because Dr. Bazylak never acted under Decedent's power of attorney, the orphans' court correctly concluded "there is nothing for Dr. Bazylak to account for during that time period." Orphans' Court Opinion, 6/6/25, at 5.

The record also reveals a long-time friendship between Dr. Bazylak and Decedent. Dr. Bazylak explained that he and his wife went to dinner with Decedent and their priest every weekend. *Id.* at 14. Dr. Bazylak and Decedent alternated paying the bill for these outings. *Id.* Dr. Bazylak alleged these social interactions occurred throughout the time period in which he received the checks. *Id.* at 14-15.[14] Additionally, Dr. Bazylak testified that he dropped off meals at Decedent's house approximately three or four times a week, when pharmaceutical representatives brought food to his office. *Id.* at 15.

As previously stated, Dr. Bazylak first met Decedent through their church in Conneaut Lake, Pennsylvania. According to Dr. Bazylak, the priest at the church asked him to help Decedent make an appointment with another physician. *Id.* at 8. Decedent eventually became one of Dr. Bazylak's patients. Dr. Bazylak described various times he attended to Decedent's injuries and illnesses. *See id.* at 39-40. After one injury, Dr. Bazylak visited Decedent several days in a row to help her change the dressings on her wounds. *Id.* at 40. Additionally, Dr. Bazylak testified that after Decedent fell while walking her dog, "Neighbors didn't call an ambulance, they called me."

---

[14] We note that counsel for the Estate specifically asked Dr. Bazylak about social interactions he had with Decedent in 2017. N.T., 6/3/25, at 14. Counsel did not ask whether Dr. Bazylak began going to dinner with Decedent prior to that year.

*Id.* Decedent had fractured her hip, and she stayed at Dr. Bazylak's home for about six weeks after surgery. *Id.*[15]

Regarding the gifts, Dr. Bazylak testified that Decedent was aware of his involvement with drug addiction treatment services and hospice. *Id.* at 42. Dr. Bazylak testified as follows:

> During our conversations, [Decedent] would say you should start your own place and continue doing that. And I told her, I didn't feel like I could do that at that time because it was a big undertaking. And our hospice director -- medical director was Sister Norma Jean, who notified me that Gannondale, which was … Bishop Gannon's old retreat, in Harborcreek, was available. And **I talked to** [**Decedent**] **about her purchasing that** and we could work up there.

*Id.* (emphasis added). Dr. Bazylak further stated,

> [Decedent] made a visit to the place and fell in love with it and wanted to purchase it because the [S]isters of [C]harity were running that place for wayward girls and it had become nonfunctional at that time[,] and she thought it would be a good place. [Decedent] said she was going to purchase it and I would run it[,] and then when it came time to purchase it, she said, Robert, I think you should have that and take care of it and you would run it.

*Id.* at 43. According to Dr. Bazylak, Decedent emphasized that he would be helping people by starting a rehabilitation and recovery facility. *See id.* Based on these conversations, Dr. Bazylak used the first check ($1,000,000 issued on August 10, 2017) to purchase the property for the rehabilitation facility. *Id.* at 42-43; *see also* Exhibit 3 (Purchase and Sale Agreement).

---

[15] Dr. Bazylak could not recall the sequence of the events he described.

Decedent gave Dr. Bazylak a second check, in the amount of $200,000, on July 20, 2018. Dr. Bazylak used the funds from the second check for payroll and to purchase equipment for Snug Harbor. N.T., 6/3/25, at 46. Dr. Bazylak explained the expenses he incurred between 2017 and 2018:

> It took us over a year to get a state license to operate a rehabilitation and recovery [facility]. Also we wanted to set up an in-patient hospice, because of the building there that was quite adaptable for hospice patients, but the township said we had to put [a] sprinkler system in before we could get a license. The sprinkler system cost $500,000. So we decided to just hold off on that for the time being and try to get the rehabilitation recovery license.

*Id.*

Decedent gave Dr. Bazylak the third check ($1,000,000 issued on November 8, 2019), which Dr. Bazylak used for Snug Harbor's upkeep and payroll expenses. *Id.* at 46.

Dr. Bazylak testified that each time Decedent gave him a check, he told her that he would begin repaying Decedent as soon as Snug Harbor started to make money. *Id.* at 46. According to Dr. Bazylak, Decedent repeatedly stated the money was a gift. *Id.* at 46-47. Dr. Bazylak also stated that he personally has contributed more than $2,000,000 to Snug Harbor, and that he has never taken a salary from its operation. *Id.* at 47-48.

Viscusi's testimony agreed that the three checks were gifts to Dr. Bazylak. *Id.* at 22.[16, 17]

As detailed above, Father Carter testified that he participated in an estate planning meeting with Decedent, Decedent's broker, and another attorney. *Id.* at 64-65. "Father Carter knew there was a period of time when [] Decedent became confused[,] but this was not during the time period when the gifts were made." Orphans' Court Opinion, 6/6/25, at 6. We reiterate that the orphans' court credited Father Carter's testimony and afforded it "significant weight." *Id.* at 7. We will not disrupt this credibility finding. *See In re Fiedler*, 132 A.3d at 1018. Though Father Carter was not present when Decedent gave Dr. Bazylak the checks, he was involved in an estate planning meeting in 2020, which occurred **before** Decedent began displaying confusion.

---

[16] Decedent paid off Viscusi's home mortgage. Viscusi testified that she ultimately repaid Decedent, without interest. N.T., 6/3/25, at 26-27. Viscusi did not indicate whether Decedent offered the money as a loan or specifically requested to be repaid.

[17] Viscusi explained she filed the petition under the belief that Decedent had expected Dr. Bazylak to repay her. N.T., 6/3/25, at 28. According to Viscusi, this assumption was based on "roundabout comments" Decedent made in approximately 2021, *id.* at 28-29, when, as the orphans' court found, Decedent exhibited confusion. *See* Orphans' Court Opinion, 6/6/25, at 2 n.7. There is no testimony suggesting that Decedent expressed an intention to be repaid at any prior time.

We acknowledge that Dr. Bazylak's legal status as Decedent's power of attorney and physician suggests the existence of a confidential relationship. However, *under these particular circumstances*, there is no evidence that Dr. Bazylak held or exerted an overmastering influence over Decedent. **See Trust under Deed of Walter R. Garrison**, 302 A.3d at 138 ("The existence of a confidential relationship is dependent upon the facts of each particular case."). The testimony depicts something other than merely a doctor-patient or agency-principal relationship; instead, the evidence demonstrates that Dr. Bazylak and Decedent shared a friendship for many years before and during the time Decedent gave Dr. Bazylak the checks.

The testimony of Dr. Bazylak and Father Carter amply supports the orphans' court's finding that the gifts were a product of Decedent's free and intelligent acts. The only contradictory testimony was provided by Viscusi, who testified regarding "roundabout comments" Decedent made to her in 2021 or later, when Decedent had become confused and generally distrusting. The orphans' court concluded Viscusi's testimony was "not surprising or particularly pertinent" in light of the fact that, beginning in approximately 2021, "Decedent became distrusting of the people in her life and began to act erratically and make nonsensical accusations toward others." Orphans' Court Opinion, 6/6/25, at 3.

Further, as the orphans' court emphasizes,

[Decedent] understood Dr. Bazylak's interest in starting a recovery facility[;] she supported it[;] and it was her choice to

give him the money to fund it. It is worth noting that it is not as if Decedent wrote one check on one occasion; she gave Dr. Bazylak three separate checks, each a year apart. After the purchase of the real property in 2017, she had time to change her mind, but Decedent continued [to] write two more checks for Dr. Bazylak to use toward the rehabilitation facility.

*Id.* at 5.

Based upon the foregoing, we conclude the three checks were valid *inter vivos* gifts from Decedent to Dr. Bazylak. We therefore affirm the orphans' court order denying and dismissing the Commonwealth's petition for citation.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

4/9/2026